Beverly IBN–TAMAS, Appellant,

v.

UNITED STATES, Appellee.

No. 12614.

District of Columbia Court of Appeals.

Argued June 30, 1978.

Decided Oct. 15, 1979.

William E. McDaniels, Washington, D. C., with whom Ellen S. Huvelle, Washington, D. C., was on brief, for appellant.

David G. Hetzel, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before KELLY, NEBEKER and FERREN, Associate Judges.

FERREN, Associate Judge:

On the morning of February 23, 1976, Dr. Yusef Ibn-Tamas was shot to death in his house, where he maintained his office. His wife of three and one-half years, Beverly Ibn-Tamas (appellant), was charged with second-degree murder while armed, D.C. Code 1973, §§ 22–2403, –3202, and second-degree murder, D.C.Code 1973, § 22–2403. This case first went to trial in September 1976, but after the jury returned a verdict of guilty of second-degree murder while armed, Judge Mencher ordered a new trial.[1] A second jury trial began on July 20, 1977, this time before Judge Stewart. On July 29, 1977, the jury again returned a guilty verdict on the charge of second-degree murder while armed. Subsequently, the court sentenced appellant to prison for a period of one to five years.

Appellant raises six issues on appeal: (1) the trial court's exclusion of expert testimony offered by the defense on the subject of battered women; (2) the prosecution's use, for impeachment purposes, of appellant's testimony at her first trial; (3) the prosecutor's comments to the jury about appellant's consultation with her attorney before interrogation by the police after her arrest; (4) the court's allowing the prosecution to question appellant about her beneficial interest in her husband's life insurance policies; (5) an allegedly prejudicial variance between the prosecutor's description of the case in his opening remarks and the evidence adduced at trial; and (6) the trial court's refusal to instruct the jury as to how appellant's particular physical condition should affect an evaluation of her self-defense claim.

Because we cannot tell from the record whether the trial court properly analyzed the proffer of expert testimony in support of appellant's self-defense theory, we remand the case for further proceedings, as appropriate, and for additional findings and conclusions on that issue. As to all other alleged errors, we affirm.

## I. THE FACTS

In order to demonstrate the relevance of the proffered expert, we must provide considerable background information taken from appellant's testimony (Part A *infra*), as well as the facts directly leading to the shooting incident (Part B *infra*).

---

1. The judge concluded that a contingent fee arrangement presented to appellant by her first counsel just before she was to testify created a conflict of interest. This led the judge to believe that appellant's right to effective assistance of counsel had been prejudiced. In addition, the judge concluded that the jury's use of a dictionary during deliberations created a prima facie case of prejudice. The details leading to Judge Mencher's declaration of a mistrial are discussed more fully in Part III *infra.*

## A. *Background Testimony*

Appellant testified that when she met her husband, Dr. Ibn-Tamas, she was working as a registered nurse in the prenatal care unit at Jacobi Hospital in New York City, where he was a resident in neurosurgery. Shortly after the doctor's divorce from his first wife in September 1972, he married appellant. They located in Miami, Florida, where he was finishing his residency. Appellant continued to work as a private duty nurse until the birth of their daughter the following autumn. In 1974, the family moved to Washington, D. C., where the doctor, assisted by his wife, established a private practice out of an office in their home.

The marriage was marred by recurring violent episodes separated by periods of relative harmony. In 1974, for example, the doctor accused his wife's visiting friend of being a lesbian and abruptly ordered her to leave their apartment. When Mrs. Ibn-Tamas later protested his rudeness, he struck her with his fist, a shoe, and another object, and dragged her and their six-month-old baby off a bed and onto the floor. Several weeks later, during an argument at his mother's house, the doctor allegedly pulled the appellant from her chair onto a cement porch and caused her to lose consciousness by putting his knee to her neck.[2] Days later, he threatened her with a loaded gun when she hesitated over co-signing some financial documents. Shortly thereafter, while they were driving north to Washington to establish their new residence, the doctor and his wife argued over whether

she would have to stay at his mother's house while their new home was being prepared. He ended the argument by forcing her out of the car along an interstate highway and driving off with their infant daughter.

Life improved for the Ibn-Tamases temporarily after their move to Washington; but throughout the first two months of 1976 their relationship became increasingly marked by violence. Although Mrs. Ibn-Tamas was several months pregnant with their second child, the doctor on two occasions in January and February punched her in the neck and hit her in the head and face with his fists,[3] leaving her in one instance with a split and bleeding lip. During this period, Dr. Ibn-Tamas also abused appellant verbally, saying that the child she was carrying was not his and threatening her with a fractured skull should she attempt to leave or seek a divorce.

In addition to this first-hand experience, Mrs. Ibn-Tamas claimed at her trial to have been aware, prior to February 23, 1976, of similar violent incidents involving her husband and others.[4] The testimony of Olga Powell indicated that on April 7, 1971, Dr. Ibn-Tamas, then known as Robert Gamble,[5] ordered Ms. Powell out of the apartment that she shared with the doctor and his first wife. When she demurred, the doctor broke down her door, fired a .38 caliber revolver in her direction, and threw her belongings out the window. A criminal complaint for assault with a weapon was later reduced to an administrative fine. The decedent's first wife, Barbara Gamble

---

2. At trial, appellant's description of her husband's violent behavior was contradicted only by the testimony of Ms. Faye Davis, the decedent's mother. She admitted seeing her son slap appellant during the incident at her home in Washington but denied that he had rendered appellant unconscious by thrusting his knee into her neck. However, appellant's mother testified that she had observed a bruise mark on her daughter's neck immediately after this incident.

3. On cross-examination, the government challenged this testimony by implying that the alleged behavior was inconsistent with the natural inclination of a surgeon to protect his hands

and with the teachings of Dr. Ibn-Tamas' Muslim faith.

4. Appellant claimed to have been aware of these prior incidents through conversations with the decedent and through the decedent's diary and papers filed in connection with his divorce from his first wife, which the decedent had shown her.

5. In 1971, Dr. Ibn-Tamas became an Orthodox Muslim and changed his name from Robert Gamble to A.R. Yusef Ibn-Tamas. His first wife's refusal to "embrace the Koran" was one of the factors leading to their separation.

Carter, testified that on March 23, 1971, she called the police after the doctor had pushed her onto the floor and hit her with a clenched fist during a fight. The doctor left for work just before the police arrived in response to her call.[6] Finally, Marshall Whitley, a relative of the decedent's sister-in-law, testified that on June 29, 1974, the doctor had come to his family home, got into an argument, and pulled a gun on Mr. Whitley and his father. As a result of the incident, Mr. Whitley filed a citizen's complaint against the doctor with the United States Attorney's Office.[7]

### B. The Events on the Morning of the Shooting

Appellant testified that on February 23, 1976, she was aware of her husband's past violence toward herself and others, as well as the fact that her husband kept loaded revolvers and shotguns in the house and the adjoining office.[8] That morning, a dispute erupted at the breakfast table. Despite his wife's protests that she was pregnant and that he had promised not to hit her again, Dr. Ibn-Tamas hit appellant over the head, first with a magazine and then with his fists. He then dragged her upstairs, pulled out a suitcase, and told her to pack and get out of the house by 10 a. m. Appellant further testified that when she objected, he hit her with his fists and then with a wooden hairbrush. Trying to protect her abdomen from the attack, appellant turned her body and absorbed the blows on her buttocks and thighs.[9] Dr. Ibn-Tamas then grabbed a .38 caliber revolver, pointed it at his wife's face, and said, "You are going out of here this morning one way or the other."

Thereafter, the doctor went downstairs to his office adjoining the house, and Mrs. Ibn-Tamas remained with her daughter in the bedroom. She called her husband in his office to plead with him to be reasonable, but he told her he did not want to argue anymore and that she should just pack.

Shortly thereafter, the doctor came back into the main part of the house. The events which took place during the next few moments were a matter of sharp controversy at trial. There was conflicting testimony based on the recollections of appellant and of Lynette McCollom, the doctor's secretary, who had just arrived at work and overheard the shooting from the adjoining office area.

Appellant testified that the doctor returned to the bedroom and resumed the attack. She was pushed toward the bureau on top of which her husband had left the gun that he had threatened her with moments earlier. Thinking that he was going to grab the gun, she picked it up, begged him to leave her alone, and fired the gun toward the bottom of the door to scare him. The doctor then left the room; and, according to appellant, she took her daughter in hand and started toward the stairway leading down to the first floor and the door. As she reached the top of the front stairway, however, her husband allegedly jumped out from behind the wall at the landing. Appellant fired twice more. Although it was not immediately apparent to appellant, one of these two shots struck the doctor in the abdomen. There was no immediate external bleeding; and the doctor remained standing as he backed down the stairs and into an examination room connected to the house by a swinging door at the bottom of the stairs. Appellant proceeded down the steps. As she reached the bottom landing, however, her daughter jumped out in front of her, looked into the

---

6. Affidavits submitted by Ms. Carter in connection with her separation and divorce from Dr. Ibn-Tamas asserted that the doctor had accused her friend, Ms. Powell, of being a lesbian in much the same way that he later accused the appellant's friend.

7. The government suggested, in cross-examination of Mrs. Ibn-Tamas, that this incident stemmed from the decedent's desire to gain custody of the children of his first marriage.

8. Investigation after February 23, 1976, revealed that Dr. Ibn-Tamas kept at least three guns in addition to the weapon used by Mrs. Ibn-Tamas, and hundreds of live rounds of ammunition in his house and office.

9. A medical examination of the appellant after her arrest revealed three bruises on her arms, thighs, and buttocks.

examination room, and called out "Daddy." When appellant glanced through the open door, she saw her husband crouching with what she thought was a gun in his hand.[10] She fired again, striking the doctor in the head with what proved to be the fatal blow.

Ms. McCollom testified that she arrived for work at approximately 9:00 a. m. The doctor let her in as he was passing through the office to return upstairs. Although Ms. McCollom did not see what occurred between appellant and her husband, she testified that she heard a shot approximately three seconds after she had seen Dr. Ibn-Tamas pass through the door from the examination room into the house. The shot sounded as if it had come from the landing. Ms. McCollom then heard a thumping noise, as if someone were falling down the stairs, followed by the words, "Yasmine,[11] don't shoot me anymore," and the second shot. As Ms. McCollom backed out of the office toward the door, she heard the doctor call her name. As she reached the office door leading to the street, she heard appellant say, "I am not going to leave you, I mean it"—and then she heard a third and final shot.[12]

Principally on the basis of Ms. McCollom's testimony, the prosecution suggested in its closing argument that Mrs. Ibn-Tamas, threatened with the prospect of being thrown out of her home in what she still considered a strange city, had simply decided that she had endured enough of her husband's abuse; lured him back into the house with a telephone call; ambushed him on the stairs; and followed him downstairs, shooting him in the forehead at point blank range as he lay on the examination room floor from the previous shot. Through

questioning, the prosecution further suggested that appellant stood to gain financially from her husband's death, and accused her of being jealous of the other women he told her he had dated during the last few weeks before the shooting.

## II. EXPERT TESTIMONY ABOUT "BATTERED WOMEN"

Appellant claims the trial court erred in excluding the testimony of Dr. Lenore Walker, a clinical psychologist, proffered as a defense expert on the subject of "battered women." Specifically, the defense proffered Dr. Walker for two purposes: to describe the phenomenon of "wife battering," and to give her opinion of the extent to which appellant's personality and behavior corresponded to those of 110 battered women Dr. Walker had studied. The defense claimed the testimony was relevant because it would help the jury appraise the credibility of appellant's contention that she had perceived herself in such imminent danger from her husband that she shot him in self-defense.

The trial court refused to permit this expert testimony on three grounds. First, it would "go [ ] beyond those [prior violent] acts which a jury is entitled to hear about, sift, and try to understand the circumstances under which they arose, and draw conclusions therefrom." Second, it would "invade[ ] the province of the jury, who are the sole judges of the facts and triers of the credibility of the witnesses, including the defendant." Third, Dr. Walker, "of necessity, concludes that the decedent was a batterer. And that is not being tried in this case. It is the defendant who is on trial."

10. The prosecution tried to impeach this testimony by showing that appellant's statement to police following her arrest contained no reference to the fact that she thought the decedent was holding a gun at this point. Appellant replied that she did not reveal this fact to the police initially because she thought that her husband was alive and "maybe everything would be all right."

11. Ms. McCollom testified that the decedent referred to his wife as "Yasmine."

12. Police investigators found four expended shells in the weapon that Mrs. Ibn-Tamas had used. The government's theory to explain the discrepancy between this fact and Ms. McCollom's claim of hearing only three shots was that appellant had fired a test shot through her bedroom door to see if the gun was loaded sometime prior to the doctor's return to the house.

Our "scope of review on this issue is narrow, for the 'trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous.'" *Douglas v. United States*, D.C.App., 386 A.2d 289, 295 (1978), (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). In exercising its discretion, the trial court must be guided by the principles that "the 'defense should be free to introduce appropriate expert testimony,'" *Fennekohl v. United States*, D.C.App., 354 A.2d 238, 240 (1976) (quoting *Kaplan v. California*, 413 U.S. 115, 121, 93 S.Ct. 2680, 37 L.Ed.2d 492 (1973)), and that such evidence should be admitted if "the opinion offered will be likely to aid the trier in the search for truth." *Jenkins v. United States*, 113 U.S.App.D.C. 300, 306, 307 F.2d 637, 643 (1962). At the same time, because expert or scientific testimony possesses an "aura of special reliability and trustworthiness," *United States v. Amaral*, 488 F.2d 1148, 1152 (9th Cir. 1973), the proffer of such testimony must be carefully scrutinized.

Over the years, appellate courts have applied two levels of analysis to a trial court's ruling on expert testimony. First, there is the question of admissibility, for which a three-fold test is applied. *See Dyas v. United States*, D.C.App., 376 A.2d 827, 832, *cert. denied*, 434 U.S. 973, 98 S.Ct. 529, 54 L.Ed.2d 464 (1977). Second, the probative value of the testimony must outweigh its prejudicial impact. *See United States v. Green*, 548 F.2d 1261, 1267 (6th Cir. 1977); *Amaral, supra*.

### A. Admissibility

Of the three grounds given by the trial court for excluding Dr. Walker's testimony, only the second (it would "invade[ ] the province of the jury . . . .") goes to

admissibility. There are two ways in which an expert can preempt the jury's function. The expert either can speak too directly to the ultimate issue (*i. e.*, guilt or innocence), *see United States v. Spaulding*, 293 U.S. 498, 506, 55 S.Ct. 273, 79 L.Ed. 617 (1935); *Lampkins v. United States*, D.C.App., 401 A.2d 966, 970 (1979); *Washington v. United States*, 129 U.S.App.D.C. 29, 40–41, 390 F.2d 444, 455–56 (1967), or can speak to matters in which "the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions," *Lampkins, supra* at 969 (*i. e.*, the matter is "'not beyond the ken of the average layman,'" *id.*; *Dyas, supra* at 832).

1. Here, the expert would not preempt in either fashion. As to the first—the "ultimate facts" or "ultimate issue" rule—Dr. Walker was not going to express an opinion on the ultimate question whether Mrs. Ibn-Tamas actually and reasonably believed she was in danger when she shot her husband. Rather, this expert would have merely supplied background data to help the jury make that crucial determination. *See United States v. Hearst*, 412 F.Supp. 889 (N.D. Cal.1976) (*Hearst I*). In any event, the ultimate issue rule has, over time, been reduced to a prohibition only against questions to an expert "which, in effect, submit the whole case to an expert witness for decision." *Id.*[13] There is no such risk here.

2. Even when an expert is not speaking to the ultimate facts or issue, he or she cannot testify to matters which "the jury itself is just as competent" to consider. *Lampkins, supra* at 969. In order to evaluate this concern, we have adopted a three-fold test for admissibility:

(1) the subject matter "must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman"; (2)

13. In recent years, courts in this jurisdiction have relaxed the ultimate facts rule, holding that an expert may state a conclusion on such facts provided the conclusion is one that laymen could not draw. Thus, expert opinion testimony will not be excluded merely because it amounts to an opinion upon ultimate facts. *See, e. g., Casbarian v. District of Columbia,*

D.C.Mun.App., 134 A.2d 488, 491 (1957). ("The real test is not that the expert opinion testimony would go to the very issue to be decided by the trier of fact, but whether the special knowledge or experience of the expert would aid the court or jury in determining the questions in issue"). [*Lampkins, supra* at 970.]

"the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth"; and (3) expert testimony is inadmissible if "the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert." [*Dyas v. United States, supra* at 832 (quoting McCormick on Evidence § 13 (2d ed. E. Cleary 1972)) (emphasis omitted).]

*See Waggaman v. Forstmann*, D.C.App., 217 A.2d 310, 311 (1966). Thus, the subject of the testimony must lend itself to expertise, the proffered expert must be qualified to give it, and experts must have studied the subject in a manner that will justify an expert opinion.

■ The substantive element of this test, whether the expert witness' subject matter is "beyond the ken of the average layman," means that Dr. Walker's testimony, to be admissible, must provide a relevant insight which the jury otherwise could not gain in evaluating appellant's self-defense testimony about her relationship with her husband. More specifically, Dr. Walker must purport to shed light on a relevant aspect of their relationship which a layperson, without expert assistance, would not perceive from the evidence itself.

On direct examination, Mrs. Ibn-Tamas had testified that immediately before the shooting Dr. Ibn-Tamas had told her to pack and leave home by 10:00 a. m. When she replied that she could not, he hit her in the head, under the arms, and in the thighs, and kicked her in the stomach even though she was pregnant. She continued:

I saw he was looking over there on the bureau, so I saw the pistol, and he looked like he was going to go for the pistol. I just picked it up. I shot the bottom of the door, and I said, "Just please get out of here, and please, please leave us alone."

(The witness is crying.)

And then he was backing out of the door, and he said, "You are going now." And he just kept looking at me. And I heard him go down the steps, and so I had my little girl's hand. I knew after I shot that shot I had to get out of the house. I just knew he was going to kill me. So I had my little girl in my hand and we started to go down the steps real fast, and we got to the top and he jumps back from the landing. I thought he had gone all the way down, and so I took my leg back, pulled my little girl back, and we were next to the wall, and I just shot the gun.

He backed up against the wall, (indicating) went back to the wall, and he kept down at the steps with his eyes still on my face, and he went down the stairs, jumping two at a time, doing like that, and he kept looking back with his back to the wall, and on the way down the steps he said, "I am going to kill you, you dirty bitch."

He got at the bottom of the steps and he looked at me and he just went in the office, and I knew I had to get out of that door.

(The witness is crying.)

I knew it. And I had my little girl by the hand. She seemed like—when he got to the bottom of the steps, she thought we were supposed to follow him. She jumped like she was going in front, and she looks and she says, "Daddy." And I looked in there and he was, he was just like he was waiting for me. He was standing over just like—something like that. (Indicating.) And I just knew he had a gun. I shot in the room, and I turned to go out the front door, and after I turned my head I heard him fall. I heard him fall, and I knew I had shot him.

On cross-examination the government attempted to discredit this testimony by suggesting to the jury, through its questions, that Mrs. Ibn-Tamas' account of the relationship with her husband over the years had been greatly overdrawn, and that her testimony about perceiving herself in imminent danger on February 23, was therefore implausible. For example, the government implied to the jury that the logical reaction

of a woman who was truly frightened by her husband (let alone regularly brutalized by him) would have been to call the police from time to time or to leave him.[14] In an effort to rebut this line of attack by the government, the defense proffered Dr. Walker's testimony to (1) inform the jury that there is an identifiable class of persons who can be characterized as "battered women," (2) explain why the mentality and behavior of such women are at variance with the ordinary lay perception of how someone would be likely to react to a spouse who is a batterer, and thus (3) provide a basis from which the jury could understand why Mrs. Ibn-Tamas perceived herself in imminent danger at the time of the shooting.

More specifically, Dr. Walker told the trial court, out of the presence of the jury, that she had studied 110 women who had been beaten by their husbands. Her studies revealed three consecutive phases in the relationships: "tension building," when there are small incidents of battering; "acute battering incident," when beatings are severe; and "loving-contrite," when the husband becomes very sorry and caring. Dr. Walker then testified that women in this situation typically are low in self-esteem, feel powerless, and have few close friends, since their husbands commonly "accuse[ ] them of all kinds of things with friends, and they are embarrassed. They don't want to cause their friends problems, too." Because there are periods of harmony, battered women tend to believe their husbands are basically loving, caring men; the women assume that they, themselves, are somehow responsible for their husbands' violent behavior. They also believe, however, that their husbands are capable of killing them, and they feel there is no escape. Unless a shelter is available, these women stay with their husbands, not only because they typically lack a means of self-support but also because they fear that if

they leave they will be found and hurt even more. Dr. Walker stressed that wife batterers come from all racial, social and economic, groups (including professionals), and that batterers commonly "escalate their abusiveness" when their wives are pregnant. She added that battered women are very reluctant to tell anyone that their husbands beat them. Of those studied, 60% had never done so before (Dr. Walker typically found them in hospitals), 40% had told a friend, and only 10% had called the police.

When asked about appellant, whom she had interviewed, Dr. Walker replied that Mrs. Ibn-Tamas was a "classic case" of the battered wife. Dr. Walker added her belief that on the day of the killing, when Dr. Ibn-Tamas had been beating his wife despite protests that she was pregnant, Mrs. Ibn-Tamas' pregnancy had had a "major impact on the situation . . .. [T]hat is a particularly crucial time."

Dr. Walker's testimony, therefore, arguably would have served at least two basic functions: (1) it would have enhanced Mrs. Ibn-Tamas' general credibility in responding to cross-examination designed to show that her testimony about the relationship with her husband was implausible; and (2) it would have supported her testimony that on the day of the shooting her husband's actions had provoked a state of fear which led her to believe she was in imminent danger ("I just knew he was going to kill me"), and thus responded in self-defense. Dr. Walker's contribution, accordingly, would have been akin to the psychiatric testimony admitted in the case of Patricia Hearst "to explain the effects kidnapping, prolonged incarceration, and psychological and physical abuse may have had on the defendant's mental state at the time of the robbery, insofar as such mental state is relevant to the asserted defense of coercion or duress." *Hearst I, supra* at 890. Dr. Walker's testimony would have supplied an

14. Q. And during the time in Miami, did you ever leave him?
A. No, I didn't.
Q. Did you ever call the police?
A. No, I didn't. He told me he would kill me if I called the police.

The prosecutor stressed this theme once again during closing argument: "Maybe she put up with too much too long, although whose fault was that? She could have gotten out, you know."

interpretation of the facts which differed from the ordinary lay perception ("she could have gotten out, you know") advocated by the government. The substantive element of the *Dyas, supra,* test—"beyond the ken of the average layman"—is accordingly met here.

We conclude, therefore, that as to either substantive basis for ruling that Dr. Walker's testimony would "invade[ ] the province of the jury"—either the "ultimate issue" or the "beyond the ken" basis—the trial court erred as a matter of law.

3. Because *Dyas, supra,* provides a three-fold test, we must consider, next, whether the trial court can be said to have ruled, implicitly, that the expert testimony was inadmissible for failure to meet either the second or third elements of that test.

■ By way of background, we note that although a trial court's ruling to exclude expert testimony is reversible only for abuse of discretion—for being "manifestly erroneous," *Douglas, supra* at 295—there is an important tradeoff for giving the trial court such latitude: that court must take no shortcuts; it must exercise its discretion with reference to *all* the necessary criteria. *Johnson v. United States,* D.C.App., 398 A.2d 354, 363–67 (1979). Otherwise, the very reason for such deference—*i. e.,* the trial court's opportunity to observe, hear, and otherwise evaluate the witness—will be compromised. Thus, the appellate court must not affirm a ruling premised on trial court discretion unless the record clearly manifests either (1) that the trial court has ruled on each essential criterion, or (2) that the trial court, as a matter of law, had "but one option." *Id.* at 364.

We therefore confront the question whether the record clearly manifests a trial court ruling that Dr. Walker did not have "sufficient skill, knowledge, or experience" in the field (second *Dyas* criterion), or that "the state of the pertinent art or scientific knowledge" was insufficient for an expert opinion (third *Dyas* criterion).

■ Dr. Walker testified as to her credentials, her study of battered women, and her diagnosis of Mrs. Ibn-Tamas. The court then inquired whether Dr. Walker was offering a "medical diagnosis" and asked several questions about the 110 women she had interviewed. After reviewing the record, we cannot say that the trial court's ruling was meant to encompass the second or third *Dyas* criterion. We are mindful that in scrutinizing the trial court's ruling for abuse of discretion, the reviewing court "may examine the record and infer the reasoning upon which the trial court made its determination," *Johnson, supra,* at 366; but it would stretch the record too far to conclude that the trial court, in ruling that Dr. Walker's testimony would "invade the province of the jury," implied additional findings that Dr. Walker's credentials are unworthy or her study unreliable.

■ 4. The question thus becomes whether the trial court, despite its failure to rule on the second or third *Dyas* criterion, had "but one option," *Johnson, supra* at 364—*i. e.,* whether Dr. Walker's testimony is inadmissible as a matter of law. This question is derived from a "settled rule":

[I]n reviewing the decision of a lower court, it must be affirmed if the result is correct "although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224. The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate. [*Securities and Exchange Commission v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943).]

*Accord, Duddles v. United States,* D.C.App., 399 A.2d 59, 64 (1979) ("this court can affirm the denial of a motion to suppress if, for any reason, the ruling is correct"); *Simpkins v. Brooks,* D.C.Mun.App., 49 A.2d 549, 552 (1946) (decision "must be affirmed if the result was correct although the trial court relied upon a wrong ground or gave a

wrong reason").[15] The *Chenery* rule, therefore, permits the appellate court to affirm a trial court ruling when the court gave a wrong reason—or gave no reason at all [16] —if the ruling is "correct." For example, the appellate court can affirm, despite the trial court's erroneous reasoning, by applying an alternate legal ground to undisputed facts, e. g., *Duddles, supra; Simpkins, supra,* or can affirm when the trial court gives no reasons as long as there is conclusive evidentiary support for the applicable legal rule, e. g., *Harper v. Wyatt,* D.C.App., 281 A.2d 442 (1971); *Karath v. Generalis,* D.C.App., 277 A.2d 650 (1971). *See* notes 15 and 16 *supra.* In either situation, the appellate court is using its traditional power, as final arbiter, to apply the law to the facts, and is holding that the decision is correct as a matter of law in the sense that the trial court, properly instructed, inevitably would reach the same result. In such cases, the appellate court avoids the waste of judicial resources that would result from a remand to the trial court for a mere rewrite of the decision.[17]

In the present case, therefore, the question is whether the trial court was "correct" in ruling Dr. Walker's testimony inadmissible because—even assuming that the trial court considered only the first *Dyas* criterion—we can say, on this record, that the defense proffer necessarily failed to meet either the second or third *Dyas* criterion. We turn to that inquiry.

5. The most we can say from this record is that the second *Dyas* criterion—sufficient skill, knowledge, or experience in the ex-

15. In *Duddles, supra,* this court rejected the trial court's law-of-the-case analysis but affirmed on the ground that defendant had waived his right to pursue a motion to suppress. In *Simpkins, supra,* this court disagreed with the trial court's view that a particular Rent Act did not authorize civil actions but affirmed on the ground that plaintiff did not state a cause of action.

16. In *Harper v. Wyatt,* D.C.App., 281 A.2d 442 (1971), the trial court granted two counts of a counterclaim without giving reasons. This court held that the evidence supported the grant of one, but not two. In *Karath v. Generalis,* D.C.App., 277 A.2d 650 (1971), this court affirmed a damage award against a union business agent for depriving a member of a job as a waiter for one day. Although the trial court did not discuss the alleged applicability of a union rule authorizing such a penalty for " 'causing a disturbance or fight during roll call,' " this court affirmed on the ground that, assuming the rule applied, the evidence supported a conclusion that the plaintiff's conduct had fallen short of such a disturbance. *Id.* at 653.

17. Our dissenting colleague cites several cases for the proposition, apropos of *Chenery, supra,* that the ruling should "be affirmed so long as a plausible ground for affirmance exists." *Post* at 651. That is not correct. As indicated in section 3 *supra,* the ruling on admissibility of expert testimony is committed to trial court discretion—a dimension that distinguishes this case from *Duddles, supra; Simpkins, supra; Harper, supra;* and *Karath, supra,* which simply apply correct law to established facts. *See* notes 15 and 16 *supra.* Thus, our colleague misses the point: his own finding of a plausible ground of affirmance may be contrary to the trial court's discretionary ruling here, since we cannot tell what criteria the court applied. The trial court may have found that the second and third *Dyas* criteria *were* satisfied but excluded the testimony on the ground that the first one (contrary to our holding) was not. On the other hand, if the trial court ruled solely on the basis of the first *Dyas* criterion without reaching the second or third, this court should not substitute its judgment in a discretionary ruling—unless the evidence, despite our inability to observe the witness, permits but one interpretation. *See Johnson, supra* at 364. If we were to rule without the benefit of either trial court discretion, on the one hand, or an opportunity to observe and appraise the witness, on the other, at least one party to a criminal proceeding would be adversely affected in the sense of losing the right to a discretionary ruling. Each party is entitled to an informed judgment, based on face-to-face evaluation of a witness, not merely on a detached appellate court acknowledgment of a "plausible ground" for a determination which, in fact, the trial court may have never made.

This is not to suggest that a trial court must articulate reasons, let alone correct reasons, for every evidentiary ruling. In most instances, the appellate court will be able to "infer the reasoning upon which the trial court made its determination." *Johnson, supra* at 366. As a practical matter, therefore, the problem usually will arise only in cases, such as this one, where the trial court confronts multiple or alternate criteria for a single discretionary ruling, and the appellate court cannot tell from the record whether the judge sufficiently addressed each criterion required for the ruling.

pert's field—may or may not have been satisfied. Although no one has questioned Dr. Walker's qualifications as a clinical psychologist,[18] the expert's credentials must be sufficient for the type of psychological testimony proffered.

The defense proffered Dr. Walker not only to give the jury a description of the phenomenon called "wife battering" but also, more specifically, to compare appellant with the battered women Dr. Walker had identified and studied. In *Jenkins, supra,* the federal circuit court in this jurisdiction addressed the question whether experts without medical training—in that case, three defense psychologists—were qualified to diagnose the presence of a specific mental illness. The court concluded that although the defense experts' lack of medical training left them unqualified to treat any pathology, these psychologists were not necessarily lacking in the expertise required to suggest "the diagnostic category into which an accused's condition fits, and relat[e] it to his past behavior . . . ." *Id.* 113 U.S. App.D.C. at 307, 307 F.2d at 644. The court emphasized that, in fact, "[t]he kinds of witnesses whose opinions courts have received, even though they lacked medical training and would not be permitted by law to treat the conditions described, are legion." *Id.* (Emphasis omitted).[19]

On this record, we cannot resolve the question of Dr. Walker's qualifications; but we can say on the basis of her background, see note 18 *supra,* coupled with *Jenkins, supra,* that she cannot be disqualified as a matter of law.[20]

6. We turn, finally, to the third *Dyas* criterion: whether "the state of the pertinent art or scientific knowledge" is sufficient to permit an expert opinion. The government argues that the "battered woman" concept is not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant testimony under the guise of expertise. The government relies substantially on *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1910):

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made *must be sufficiently established to have gained general acceptance in the particular field in which it belongs.* [*Id.* at 47, 293 F. at 1014 (emphasis added).]

The government is mistaken. First, as discussed earlier, the relevant expert diagnosis is not limited here to medical diagnosis; the "particular field" in which Dr. Walker's testimony belongs," *id.,* is broad enough to include clinical psychology. *See*

18. Dr. Walker received her doctorate in psychology from Rutgers University. She has been an assistant professor of psychology at Rutgers Medical School and, at the time of trial, had a private practice and taught in the Psychology Department at Colorado Women's College. She is a member of the American and Colorado Psychological Associations, the American Association of Advancement for Behavior Therapy, the Association for Women in Psychology and the Colorado Association for Aid to Battered Women. She served as an advisor to the United States Commission on Civil Rights, and has been under contract with Harper & Row to publish the research that she has been conducting for several years on wife battering. She has also testified as an expert in a case, similar to the present one, involving a battered woman who was accused of killing her husband.

19. Whether any of the three psychologists was qualified to testify that Jenkins was suffering from schizophrenia, the court held, could only be determined by considering the clinical experience and other professional qualifications of each of the would-be expert witnesses. *Jenkins, supra,* at 308–09, 307 F.2d at 645–46. The court implied that psychologists without the appropriate clinical background were not qualified to offer an opinion as to whether the defendant suffered from a mental disease or defect. *See id.*

20. Our dissenting colleague agrees. He refers to only one question by the trial judge which "might have been a step towards the second test." *Post* at 648 n. 6.

*Jenkins, supra.* Next, it is important to note that the third criterion focuses on the general acceptance of a particular methodology in the field, not (as the government would have it) on the subject matter studied. The United States Court of Appeals for the District of Columbia Circuit recently emphasized that *Frye, supra* —which rejected admissibility of lie detector results— dealt with "admissibility of expert testimony based on new methods of scientific measurement." *United States v. Addison,* 162 U.S.App.D.C. 199, 201, 498 F.2d 741, 743 (1974). Thus, the third criterion is directed to the general acceptance of generic categories of scientific inquiry, such as use of the polygraph, spectrographic identification, psycholinguistics, tests for marijuana, and even neutron activation analysis, as well as the variety of analyses used by psychiatrists and clinical psychologists.[21]

It is true that the state of scientific knowledge itself can be so meager in a particular field of study that courts will preclude reliance on expert testimony about it, see, e. g., *Tonkovich v. Dept. of Labor & Industries,* 31 Wash.2d 220, 195 P.2d 638 (1948) (court took judicial notice that cause of cancer is unknown and ignored expert testimony that plaintiff's cancer resulted from on-the-job injury); but such instances merely reflect the court's conclusion that no reliable methodology for making the inquiry has been discovered; the proffer did not meet a threshold test of believability. Basically, therefore, the third test deals with the "state of the art" of inquiry, not with the quantity of substantive knowledge. *See Douglas, supra,* at 296; *United States v. Hearst (Hearst II),* 412 F.Supp. 893, (N.D.Cal.1976), *aff'd,* 563 F.2d 1331 (9th Cir. 1977).[22]

In summary, satisfaction of the third *Dyas* criterion begins—and ends—with a determination of whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology.[23] Thus, the relevant question here is whether Dr. Walker's methodology for identifying and studying battered women has such general acceptance—not whether there is, in addition, a general acceptance of the battered woman concept derived from that methodology.[24] Again, on this record,

21. *See, e. g., Brown v. United States,* D.C.App., 384 A.2d 647 (1978) (voice prints inadmissible); *Moore v. United States,* D.C.App., 374 A.2d 299 (1977) (Duquenois-Levine and thin layer chromatography tests for marijuana admissible); *United States v. McDaniel,* 176 U.S.App.D.C. 60, 538 F.2d 408 (1976) (voice prints inadmissible); *Addison, supra* (same); *United States v. Stifel,* 433 F.2d 431 (6th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971) (neutron activation analysis of bomb fragments admissible); *Frye, supra* (polygraph results inadmissible); *United States v. Hearst (Hearst II),* 412 F.Supp. 893 (N.D.Cal.1976), *aff'd,* 563 F.2d 1331 (9th Cir. 1977) (stylistic comparison of defendant's known writings and utterances with later writings and tape recordings inadmissible).

22. Perhaps the most useful illustration here is a comparison of *Hearst I, supra,* and *Hearst II, supra.* In the first case, the court admitted psychiatric testimony about the impact of kidnapping and related incarceration on the defendant's later mental state when she allegedly committed a crime. The expert's qualifications and methodology were apparently not questioned. In *Hearst II,* however, the psycholinguistics methodology was challenged and held by the court to be insufficiently established to warrant admissibility. These two decisions are instructive on the kinds of expert testimony that are and are not admissible and thus on the proper—and limited—role of the *Frye* test.

23. Although the third criterion adopted by this court in *Dyas, supra,* requires the trial court to evaluate the proffered expert's methodology by reference to the degree of "general acceptance in the particular field in which it belongs," *Frye, supra,* 54 App.D.C. at 47, 293 F. at 1014, the 1972 edition of McCormick on Evidence, *supra,* encourages courts, in considering scientific evidence, to ignore the third test, relegating any disagreement in the scientific community to the weight, not admissibility of the testimony. *See id.* at § 203.

24. If, as the government implies, the results of studies about battered women must be in accord with each other and have general acceptance among psychologists before the experts who conducted the studies can testify about them in court, we would shift to the judge such responsibility for evaluating expert credibility that the role of expert testimony might be changed dramatically. For example, if there were conflicting experts, would the judge conclude that neither could testify? That only the more persuasive one could? That a psychia-

we cannot say, as a matter of law, that Dr. Walker's methodology falls short.[25]

7. We conclude, therefore, that the trial court erred in ruling Dr. Walker's testimony inadmissible on the ground that it would invade the province of the jury; and, on the record to date, we cannot exclude that testimony as inadmissible on any other ground.

B. *Probative Value v. Prejudicial Impact*

Because "admissibility" remains an open question, we turn to the second level of inquiry: probative value versus prejudicial impact. The trial court's first and third grounds for excluding Dr. Walker's testimony related to the prejudicial character of the evidence. Specifically, the court stated that the evidence would "go[ ] beyond those [prior violent] acts" which a jury should consider [26] and that, in effect, the testimony put the decedent on trial as "a batterer, [a]nd that is not being tried in this case."

■ We have stated, apropos of this first ground, that prior acts of violence are admissible in "homicide cases where the defendant raises the claim of self-defense against the decedent as the alleged first aggressor." *United States v. Akers*, D.C. App., 374 A.2d 874, 877 (1977) (emphasis omitted). The trial court, in fact, admitted a substantial amount of evidence relating to the decedent's earlier attacks on the appellant and other persons. *See* Part I.A. *supra*. In light of the admission of this evidence, it is apparent that the incremental, prejudicial impact of Dr. Walker's testimony on battered wives, including the labeling of Dr. Ibn-Tamas as a batterer, would have been minimal.

In contrast, as we have previously observed, the testimony on battered wives was highly probative. Because Mrs. Ibn-Tamas' identity as a "battered wife," if established, may have had a substantial bearing on her perceptions and behavior at the time of the killing, it was central to her claim of self-defense. We conclude, accordingly, as a matter of law, that the probative value of this expert testimony would outweigh the risk of "engender[ing] vindictive passions within the jury or . . . confus[ing] the issues." *Green, supra* at 1268.[27]

trist could while a psychologist could not? The judge's role is properly limited to verifying credentials, including findings that the scientific field is generally recognized and that the methodology proffered is generally accepted by the expert's colleagues in the field. The judge is not to take over the jury's function of weighing the persuasiveness of the testimony.

Although our analysis of this third test does not turn on the extent to which Dr. Walker's methodology has been used to study "battered wives," we note that the subject has received considerable study, Dr. Walker is not alone. *See, e. g.,* R. J. Gelles, The Violent Home: A Study of Physical Aggression Between Husbands and Wives (1972); R. Langley & R. Levy, Wife Beating: The Silent Crisis (1977); D. Martin, Battered Wives (1976); Violence In The Family (S. Steinmetz & M. Straus ed. 1974); Eisenberg & Micklow, *The Assaulted Wife: "Catch 22" Revisited,* 3 Women's Rights L.Rep. 138 (1977).

25. In the absence of a trial court ruling on the acceptability of Dr. Walker's methodology, we believe that our dissenting colleague is engaging in a questionable appellate court practice by confidently expressing his own view that "a paltry universe of 110 other women" was not a sufficient data base for Dr. Walker's study, and that her methodology was "patently inadequate." *Post* at 655. For all we know, the trial judge found—or on remand will find—Dr.

Walker's methodology quite adequate. We do not understand the basis on which an appellate judge can make a *de novo* determination here.

26. This statement could also be interpreted as a ruling that the evidence was *irrelevant.* We have already noted, however, that the first test of admissibility includes a requirement that the expert will provide a "relevant insight"; thus, relevance was inherent in our conclusion that the first test nas been met here. As we have noted, the evidence was not merely relevant; it was central to the defense of the case.

27. In this regard, we agree with the approach taken by the United States Court of Appeals for the Sixth Circuit:

[W]e follow the "better approach" recommended by United States District Judge Jack B. Weinstein and Professor Margaret A. Berger in their treatise, Weinstein's Evidence ¶ 403[03], at 18. We have attempted to tip the scales in favor of the proponent of the evidence by seeking to maximize its legitimate bearing upon the issues while minimizing its potentially abusive overtones. [*Green, supra* at 1268.]

Weinstein's Evidence ¶ 403[03] (1978) puts it this way:

The usual approach on the question of admissibility on appeal is to view both probative

### C. *Necessity for a Remand*

Because Dr. Walker's testimony was central to the defense theory of the case, we cannot conclude, as a matter of law, that the trial court's exclusion of this testimony, if ultimately in error, was harmless. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). On the other hand, because the record does not establish as a matter of law that the second and third *Dyas* criteria for admissibility have been met, we cannot say that the conviction should be reversed. Accordingly, we must remand the case for a trial court determination of admissibility consistent with this opinion. The court may take additional evidence or not, in its discretion.[28] If the trial court then rules that the testimony is admissible, it shall order a new trial. If the testimony is ruled inadmissible, appellant shall be entitled to appeal that ruling.[29]

### III. IMPEACHMENT WITH TESTIMONY FROM THE FIRST TRIAL

Appellant also claims that the trial court violated her Sixth Amendment rights by permitting her impeachment with references to her testimony at the first trial which was declared a mistrial for lack of effective assistance of counsel.

### A. *The Mistrial*

After the government had completed its case-in-chief at the first trial, appellant was to take the stand in her own defense immediately after the lunch hour. Judge Mencher, who eventually declared the mistrial, found that appellant "was to give the most critical testimony in the trial." He further found:

> force and prejudice most favorably towards the proponent, that is to say, to give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.

**28.** In ruling that the expert testimony is neither inadmissible nor admissible as a matter of law, we are not suggesting that we believe the record is so deficient that the trial court must take additional testimony before exercising appropriate discretion. Rather, we are preserving this question as one properly committed to trial court discretion, and finding that the record does not dictate a particular result. *See John-*

During the noon recess, a time when defendant's state of mind was of critical importance, her lawyers presented her with a contingent fee agreement for $70,000 payable out of her husband's life insurance policies. Defendant became hysterical. . . . Suffice it to say, the attorney/client relationship was completely ruptured and torn asunder at this critical juncture. Later, after a day of haggling, a contract was signed for $40,000. . . .

The overnight recess of September 23, 1976 was a critical time for the defense. The defendant, who had lost her composure during the day, needed to be reassured so that her crucial testimony would be as effective as possible the next day

. . . .

In this case, the defendant's lawyers, although aware of the critical nature of fully utilizing this time, squandered it to the detriment of the defendant's interests. In fact, the next morning [counsel] acknowledged that the prior evening should have been spent preparing defendant for her testimony.

Under these circumstances, the judge also questioned defense counsel's objection to an instruction for voluntary manslaughter and the failure to follow up the possibility of a plea—alternative dispositions which would have precluded counsel from receiving the $40,000 fee. Judge Mencher accordingly found "that the record leads to 'an informed speculation that [the defendant's] rights were prejudicially affected' and that the government has not proven beyond a

*son, supra* at 364. To aid the trial court, however, we have provided legal interpretations of the second and third *Dyas* criteria.

**29.** We do not go so far here as to say that a trial court's failure to articulate reasons for its ruling on the admissibility of expert testimony will always result in a remand. We do say, however, that we must remand for clarification whenever we find that the stated reasons are erroneous and we cannot be certain that the record otherwise supports the ruling as a matter of law. *See Johnson v. United States*, D.C. App., 398 A.2d 354, 365 (1979).

reasonable doubt that defendant was not so prejudiced." *See Lollar v. United States,* 126 U.S.App.D.C. 200, 204, 376 F.2d 243, 247 (1967). He then held that appellant had been "denied her Sixth Amendment right to the effective assistance of counsel," warranting a new trial.

### B. *Comparison of Fifth and Sixth Amendment Considerations*

On the authority of *Harrison v. United States,* 128 U.S.App.D.C. 245, 387 F.2d 203 (1967), *rev'd on other grounds,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), appellant claims that none of her prior testimony, elicited under unconstitutional circumstances, should have been used for impeachment at the second trial. *Harrison, supra,* was an appeal from a third trial for felony murder. In the first trial, a layman had represented appellants, pretending to be a member of the District of Columbia bar. At the third trial, the prosecution impeached one of the appellants with portions of his testimony from the first trial. The United States Court of Appeals for the District of Columbia Circuit reversed as to that appellant on Sixth Amendment grounds, holding that the constitutional right to effective assistance of counsel barred use of appellant's testimony from the earlier trial.

> Failure to heed the constitutional admonition that the accused enjoy the right to assistance of counsel negates completely the court's jurisdiction to proceed.[ ] The proceeding is void, the occurrences therein are vitiated; transpirations otherwise legal go for naught. . . .
>
> It cannot be doubted that the Government's introduction into evidence of the statements [appellant] White made during a period when he was without counsel impinges rights the Constitution renders inviolate. [*Id.* 128 U.S.App.D.C. at 254, 255, 387 F.2d at 212, 213.]

The government questions the continued validity of *Harrison, supra,* in light of the Supreme Court's more recent decisions in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and *Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). These two later cases stand for the proposition that even though the government cannot introduce a defendant's post-arrest statements in its own case when *Miranda* rights have been violated,[30] it may use those statements to impeach the defendant in the event that he or she testifies differently at trial.[31] Although *Harris* and *Hass* analyzed the Fifth Amendment right against self-incrimination, the government argues that the same reasoning should apply when Sixth Amendment rights are at issue.

The government is not necessarily correct. In *Harris* and *Hass,* the Court focused on the question whether impeachment with unlawfully obtained statements would erode, unconstitutionally, the *Miranda* deterrent to official misconduct. The Court answered "no," stressing that the privilege against self-incrimination does "not include the right to commit perjury," *Harris, supra,* 401 U.S. at 225, 91 S.Ct. at 645 even though the possibility of "uncovering impeachment material" may increase the likelihood of unlawful police interrogation. *Hass, supra,* 420 U.S. at 723, 95 S.Ct. 1215.[32] A premise of both decisions, how-

---

30. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

31. In *Harris, supra,* the defendant had not been given timely *Miranda* warnings. In *Hass, supra,* the defendant had received *Miranda* warnings and asked for counsel but made inculpatory statements after being told he could not telephone his lawyer until reaching the police station later.

32. Writing for the majority in *Hass, supra,* Justice Blackmun conceded the reduced deterrent effect of *Miranda*:

> One might concede that when proper *Miranda* warnings have been given, and the officer then continues his interrogation, *after* the suspect asks for an attorney, the officer may be said to have little to lose and perhaps something to gain by way of possibly uncovering impeachment material. This speculative possibility, however, is even greater where the warnings are defective and the defect is not known to the officer. [*Id.,* 420 U.S. at 723, 95 S.Ct. at 1221.]

Commentators after *Harris, supra,* frequently expressed a fear that the decision would en-

ever, was the reliability of the impeaching statements. The Court assumed that the "trustworthiness of the evidence satisfies legal standards," *Harris, supra,* 401 U.S. at 224, 91 S.Ct. at 645; it meets the "traditional standards of evaluating voluntariness and trustworthiness." *Hass, supra,* 420 U.S. at 723, 95 S.Ct. at 1221.

Appellant's Sixth Amendment case is different. The conflict of interest which arose between appellant and her attorney at the first trial in no sense was the product of misconduct by government officials. Thus, in this particular type of Sixth Amendment case, the government's use of appellant's prior trial testimony for impeachment would not undermine any constitutional protection against official misconduct.[33] On the other hand, we have an issue of reliability which was not present in *Harris* and *Hass.* The absence of effective counsel bears directly on the completeness, clarity, and thus reliability of a defendant's trial testimony. As a defendant is testifying, for example, the lawyer can ask additional questions to help resolve ambiguous re-

courage impermissible police conduct. *See, e. g.,* Dershowitz & Ely, *Harris v. New York; Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority,* 80 Yale L.J. 1198, 1218–21 (1971); *The Supreme Court, 1970 Term,* 85 Harv.L.Rev. 44, 51–52 (1971); 28 U.Fla.L.Rev. 289, 294 (1975); 17 How.L.J. 456, 461 (1972); 39 Geo.Wash.L.Rev. 1241, 1246–47 (1971).

**33.** There are, of course situations in which use (for impeachment purposes) of statements obtained in violation of Sixth Amendment rights would serve to encourage official misconduct. *See Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) (suppression of post-arrest statement taken while right to counsel was denied).

**34.** In *Tehan v. Shott,* 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), the Supreme Court held that the constitutional ban against a prosecutor's commenting on a defendant's failure to testify should not be retroactively applied. *Compare Kitchens v. Smith,* 401 U.S. 847, 91 S.Ct. 1089, 28 L.Ed.2d 519 (1971) (*Gideon* retroactive); *Pickelsimer v. Wainwright,* 375 U.S. 2, 84 S.Ct. 80, 11 L.Ed.2d 41 (1963) (same). In so doing, the Court distinguished and underscored the importance of the Sixth Amendment right to counsel:

sponses or to correct answers based on misunderstanding of the question. Without uncompromising legal assistance, a defendant risks misstating the truth, or making material omissions, unaware of the lapse. The Supreme Court has emphasized that the Sixth Amendment right to counsel secured in *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)— which was deemed so vital that the Court gave it retroactive application—

goes to "the very integrity of the fact-finding process" in criminal trials, and that a conviction obtained after a trial in which the defendant was denied the assistance of a lawyer "lacked reliability." [*Loper v. Beto,* 405 U.S. 473, 484, 92 S.Ct. 1014, 1019, 31 L.Ed.2d 374 (1972) (quoting *Linkletter v. Walker,* 381 U.S. 618, 639 & n. 20, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965))].[34]

We therefore have to consider whether the reliability of appellant's testimony at the first trial is sufficiently suspect that its use for impeachment at the second trial would violate the Sixth Amendment.[35]

The basic purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial or to deny a full opportunity to appeal a conviction because the accused is poor is to impede that purpose and to infect a criminal proceeding with the clear danger of convicting the innocent. [Citations omitted.] The same can surely be said for the wrongful use of a coerced confession. [Citations omitted.] By contrast, the Fifth Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth. That privilege, like the guarantes of the Fourth Amendment, stands as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone. [*Tehan, supra* at 416, 86 S.Ct. at 465.]

**35.** In focusing on the reliability issue under the Sixth Amendment, we do not mean to suggest that reliability is *necessarily* more suspect here than in the Fifth Amendment, *Miranda*-type situations dealt with in *Harris* and *Hass.* We are only saying that, given the Supreme Court's emphasis on the right to counsel, *see Loper, supra; Tehan, supra,* we cannot assume reliability of the first trial testimony, as if *Harris* and *Hass* automatically covered Sixth Amendment concerns.

This question is part of a larger one, however, for as the government points out—and as the Supreme Court emphasized in *Harris* and *Hass*—the reliability of appellant's testimony at the second trial is also at issue. We therefore must weigh two related factors here: (1) the potential unreliability of the prior testimony and (2) the potential unreliability of the second trial testimony, based on appellant's opportunity to recast it without risk of impeachment.

### C. *Other Constitutional and Common Law Evidentiary Considerations*

The Sixth Amendment question is narrowed by the fact that there are other constitutional considerations, as well as common law rules of evidence, which—for the sake of reliability—impose limitations on such impeachment. It is appropriate, therefore, to discuss these other limitations first. The Supreme Court has held, for example, that a defendant's statement on a subject introduced for the first time on cross-examination cannot constitutionally be impeached with illegally obtained evidence. *Agnello v. United States*, 269 U.S. 20, 35, 46 S.Ct. 4, 70 L.Ed. 145 (1925) (evidence from illegal search and seizure could not be used to impeach defendant's statement on cross-examination that he had never seen cocaine); *compare Walder v. United States*, 347 U.S. 62, 66, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (evidence of illegal search and seizure could be used to impeach defendant's denial, on direct examination, that he had never possessed narcotics).[36]

*Agnello* and *Walder* considered a Fifth Amendment bar to impeachment, based on seizures unlawful under the Fourth Amendment; thus, they do not automatically shape Sixth Amendment analysis any more than *Harris* and *Hass* do. But given the Supreme Court's special concern for Sixth Amendment rights, *see* note 34 *supra*, *Agnello* casts a dark constitutional cloud on impeachment of a defendant's statement on cross-examination (on a subject raised for the first time) with testimony from an earlier mistrial based on ineffective assistance of counsel.

There is another important variable. The circuit court in *Harrison, supra*, barred impeachment with prior testimony having a direct bearing on the events of the crime charged. In so ruling, however, the court distinguished with approval its line of cases, apropos of *Walder, supra*, upholding the constitutionality of impeachment with prior, inadmissible statements on "collateral matters," *i. e.*, matters unrelated to the crime charged. *Id.* 128 U.S.App.D.C. at 256, 387 F.2d at 214.[37]

The common law rules of evidence project still another, somewhat different pattern. They generally permit impeachment with prior incriminating statements (or other evidence), whether the impeached testimony occurred on direct or cross-examination. *E. g., Dane v. MacGregor*, 94 N.H. 294, 52 A.2d 290 (1947); 3A Wigmore, Evidence § 1023 (Chadbourn rev. 1970). If the testimony pertains to a collateral matter, however, the questioner must accept the answer; no extrinsic, contrary proof (*e. g.*, prior trial testimony) is admissible. *Kelly v. United States*, D.C.Mun.App., 73 A.2d 232, 234 (1950), *rev'd on other grounds*, 90 U.S.App.D.C. 125, 194 F.2d 150 (1952); *Lee v. United States*, 125 U.S.App.D.C. 126, 128–29, 368 F.2d 834, 836–37 (1966); *Ewing v. United States*, 77 U.S.App.D.C. 14, 21, 135 F.2d 633, 640 (1942), *cert. denied*, 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943).

---

**36.** We conclude that *Agnello* survives *Harris* and *Hass*. *Harris, supra* 401 U.S. at 225, 91 S.Ct. 570, relied squarely on *Walder*, which had approved and distinguished *Agnello*. *Walder, supra*, 347 U.S. at 66, 74 S.Ct. 354. *See, e. g., Jackson v. United States*, D.C.App., 377 A.2d 1151, 1154–55 (1977); *United States v. Hickey*, 596 F.2d 1082, 1088–89 (1st Cir. 1979) (collecting cases); *State v. Kidd*, 281 Md. 32, 375 A.2d 1105, 1114–16, *cert. denied*, 434 U.S. 1002, 98 S.Ct. 646, 54 L.Ed.2d 498 (1977).

**37.** *See Carter v. United States*, 126 U.S.App. D.C. 370, 371, 379 F.2d 147, 148 (1967); *Bailey v. United States*, 117 U.S.App.D.C. 241, 242, 328 F.2d 542, 543, *cert. denied*, 377 U.S. 972, 84 S.Ct. 1655, 12 L.Ed.2d 741 (1964); *Tate v. United States*, 109 U.S.App.D.C. 13, 16, 283 F.2d 377, 380 (1960).

*See* 3A Wigmore, *supra* at §§ 1001, 1002, 1019.

When we put these constitutional and evidentiary rules together, and consider impeachment at a second trial with a defendant's testimony from a previous trial where he or she lacked effective assistance of counsel, we conclude that: (1) if the subject of the statement to be impeached is elicited for the first time on cross-examination and is not a collateral issue, such impeachment is constitutionally suspect; (2) when statements on direct or cross-examination pertain to collateral issues, they can only be impeached through questioning, never with extrinsic evidence (such as the transcript from the prior trial); (3) there is a significant open question: whether, consistent with the Sixth Amendment, a prosecutor can use a defendant's testimony at a prior trial conducted without effective assistance of counsel to impeach that defendant's statement at a second trial, made on direct examination, that bears directly on the issue of guilt—*Harrison* analysis versus *Harris* and *Hass.*

### D. *The Second Trial*

We turn now to the facts of appellant's second trial. The prosecutor attempted to impeach appellant with testimony from the first trial at least ten times. We count four occasions when he attempted to impeach statements elicited on cross-examination.[38] Two of these matters were clearly collateral, *see* note 38 *supra* —and thus were not constitutionally improper. *See Walder, supra* ; note 37 *supra.* The common law rules of evidence were also satisfied, for in neither instance did the prosecutor resort to extrinsic evidence, namely the previous trial transcript. *See Kelly, supra; Lee, supra; Ewing, supra.* The other two matters covered on cross-examination, however, did bear directly on the shooting incident itself, *see* note 38 *supra* ; thus, the impeachment was constitutionally in error under *Agnello, supra.*

Six instances of impeachment related to appellant's testimony on direct examination.[39] They also had a direct relation to the shooting incident, including appellant's self-defense claim.[40] On five of these occasions, moreover, the prosecutor used the transcript of the first trial to demonstrate appellant's self-contradiction, including, in one instance, the playing of the court reporter's tape recording of the testimony. Thus, as to all these instances, we squarely face the question whether *Harris* and *Hass* undercut *Harrison.*

**38.** The prosecutor attempted to show that appellant had changed her testimony about the length of time between Dr. Ibn-Tamas' divorce from his first wife and his marriage to appellant (collateral). The prosecutor also pointed out a discrepancy in testimony about the number of housekeepers employed by Dr. Ibn-Tamas since the move to Washington, D. C. (collateral). There was an effort as well to show a discrepancy in appellant's testimony about the length of time it took her to move down the stairs after firing the second and third shots (direct bearing on incident). Finally, the prosecutor asked whether appellant, on the day of the shooting, had recalled the number of shots fired before being told by the police that there apparently had been four. When she replied that she had not been able to remember the number of shots fired the prosecutor asked whether she had not testified previously that she had recalled the number but had not thought it important to tell the police (direct bearing).

**39.** The prosecutor explored the following topics: appellant's access to diaries and affidavits from which she learned about Dr. Ibn-Tamas'

violent behavior toward his first wife and her friends; appellant's resistance to signing certain financial statements, which led to Dr. Ibn-Tamas' threatening her with a gun; the visibility of marks left on appellant's body as a result of prior abuse by the decedent; the number of times the decedent hit appellant in the abdominal area prior to the shooting; whether the decedent was standing or crouching when the final shot was fired; and whether the decedent told appellant he had been wounded by the second or third shot.

**40.** There is no bright line between matters that are "collateral" to issues in the case and those that have a direct relation to them. Long ago, the federal circuit court in this jurisdiction stated that a matter is not "collateral" if it could be admitted as part of the cross-examiner's case, independent of the witness' testimony, including "facts relating to the bias, corruption, or other specific deficiencies of the witness." *Ewing, supra,* 77 U.S.App.D.C. at 22, 135 F.2d at 641.

For purposes of decision we assume that appellant, as in *Harrison*, was without legal counsel at the first trial. We find no mitigation in the fact that appellant was assisted by a member of the bar, for counsel was compromising client interests at a "critical juncture" in the trial. Thus, we begin with the view, often expressed by the Supreme Court, that there is an inherent adverse impact on the reliability—the "trustworthiness"—of a defendant's statements at trial whenever he or she has been without counsel.

But there are countervailing considerations. Appellant elected to testify at the first trial; there was no element of coercion. *See New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979). Furthermore, prejudice is reduced by the constitutional and common law rules limiting impeachment of appellant's statements on cross-examination, and barring use of extrinsic evidence to impeach on collateral issues. Finally, still other protections at the second trial counteracted imperfections in the earlier testimony. The trial court, for example, conditioned impeachment with prior testimony on appellant's right to inform the jury as to how ineffective assistance of counsel led to the mistrial. In a pretrial Memorandum Opinion, the court provided:

> 4. The prior testimony of the defendant may be utilized by the government for purposes of impeachment but the defendant will be entitled to furnish a full explanation of the circumstances under which the prior testimony was given, including her dispute with her lawyers and the subsequent action of the original trial court.

Appellant, accordingly, was able to inform the jury fully about the circumstances that arguably detracted from the value of such impeachment to the government. In addition, her trial counsel was in a position to rehabilitate her testimony upon redirect examination if the impeachment appeared serious.[41]

We believe, under these circumstances, that the prior trial testimony on direct examination had sufficient reliability (subject to clarification at the second trial) to meet the constitutional standard of "trustworthiness and voluntariness" inherent in *Harris* and *Hass* and, more to the point, to withstand attack under the Sixth Amendment. We conclude, moreover, that the reliability interest inherent in the government's right to cross-examination—the protection against overly retailored testimony—cuts in favor of allowing impeachment at the second trial with prior testimony on the basis of *Harris* and *Hass.* We do not believe that the Constitution requires us to say with respect to the first trial, as the circuit court did in *Harrison, supra,* that "the occurrences therein are vitiated." *Id.* 128 U.S.App.D.C. at 254, 387 F.2d at 212. They are not vitiated for all purposes.

We add, finally, a note of perspective. Although the Court assumed that the impeaching statements in *Harris, supra,* and *Hass, supra,* assumed an acceptable level of trustworthiness and voluntariness, it would be misleading—despite language in cases such as *Tehan, supra* ; *see* note 34 *supra*—to presume that appellant's testimony at the first trial is inherently less reliable than uncoerced (but uncounseled) statements obtained in violation of the Fourth and Fifth Amendments. *See* note 35 *supra.* Obviously, reliability of improperly obtained statements turns on the circumstances, not on the constitutional amendment under which it is scrutinized. Thus, although the traditional Supreme Court protection of Sixth Amendment rights has required here an evaluation of reliability not undertaken in *Harris* and

---

**41.** This situation, therefore, is not akin to the one in *Loper, supra,* where the Supreme Court set aside a conviction because the defendant had been impeached with four prior felony convictions, void under *Gideon* for denial of assistance of counsel. In *Loper, supra,* counsel could not effectively explain away the prior convictions—final adjudications of guilt—whereas in the present case appellant, with the help of counsel, was in a position to clarify and thus correct her prior testimony, thereby dissipating the prejudice from lack of effective counsel at the time that testimony had been given.

*Hass,* we anticipate that the Supreme Court would hold those two cases controlling in the present context. We believe the Supreme Court has given a green light to the government's use of unlawfully obtained prior inconsistent statements for impeachment purposes, as long as the other constitutional standards and common law rules of evidence are met.

■■■ We hold, on the facts here, that when a defendant elects to take the stand and a mistrial is declared thereafter because of ineffective assistance of counsel, the government is entitled to use testimony from the aborted trial to: (1) impeach statements made by a defendant on direct examination at the second trial, or (2) impeach statements made by a defendant on cross-examination if, *but only if,* the subject has been raised on direct examination. In either instance, however, no extrinsic evidence (such as the prior trial transcript) may be used to impeach on collateral issues, and the jury must be informed about the circumstances of the mistrial.

■■■ Finally, we have considered whether the two instances of impeachment on cross-examination, resulting in constitutional error under *Agnello, supra,* warrant reversal. *See* text and cases at notes 36 and 38 *supra.* We conclude that they do not. They were harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## IV. PROSECUTOR'S CLOSING ARGUMENT

■■■ In closing argument, the prosecutor stressed the differences between appellant's story to the police immediately after the shooting and her version several hours later, once she had spoken "with her lawyer for 10 minutes out of the presence of the detective." Appellant claims reversible error based on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (government cannot use post-arrest silence to impeach defendant).

The record shows that the prosecutor's remarks were intended to rebut appellant's own suggestion that inconsistencies between her initial statements to the police and her later testimony at trial were due to anxiety and confusion at the time of arrest. Although courts have stated that a prosecutor cannot properly imply guilt from a defendant's contact with counsel, *see, e. g., United States v. Williams,* 181 U.S.App.D.C. 188, 190, 556 F.2d 65, 67 (1977); *People v. Kennedy,* 33 Ill.App.3d 857, 338 N.E.2d 414 (1975); *State v. Kyseth,* 240 N.W.2d 671, 674 (Iowa 1976); *Mays v. State,* 495 S.W.2d 833, 836 (Tenn.Ct.Crim.App.1972), such references are permissible to rebut a defendant's own assertions about post-arrest conduct. *See Stone v. Estelle,* 556 F.2d 1242, 1245–46 (5th Cir. 1977). In fact, in *Doyle, supra,* the Supreme Court noted that the fact of earlier silence could be used "to challenge the defendant's testimony as to his behavior following arrest." *Id.* 426 U.S. at 619–20 n. 11, 96 S.Ct. at 2245 n. 11. *See United States v. Blalock,* 564 F.2d 1180 (5th Cir. 1977); *United States v. Conlin,* 551 F.2d 534 (2d Cir. 1977). Accordingly, we find no error here.

## V. CONCLUSION

We also find no merit. to appellant's claims of error with respect to the prosecutor's opening remarks, the self-defense instruction, and the prosecutor's cross-examination about appellant's life insurance policies on the decedent. For the reasons set forth in Part II above, however, we remand the case for further proceedings.

*So ordered.*

NEBEKER, Associate Judge, dissenting:

The judgment of the trial court should be affirmed. First, the trial judge acted in accordance with the law in rejecting the testimony. Second, regardless of the trial judge's ruling or the basis of his ruling, the proffered expert testimony was inadmissible because as a matter of law, (1) it was irrelevant to any material issue in the case and (2) it did not meet two of the three *Dyas* tests for the admissibility of expert testimony. Therefore, assuming, *arguendo,* that the trial judge failed to rule in accord-

ance with the law, the harmless error doctrine bars any remand. *See* D.C.Code 1973, § 11–721(e); *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

## I BACKGROUND

An understanding of the substance of the expert's testimony, the law, and the theories of the parties, provides the foundation for understanding my position. Therefore, I will review them briefly. A clinical psychologist, testifying out of the presence of the jury, rendered four opinions: (1) some husbands pass through a three-phase cycle in the manner they act towards their wives; (2) where husbands pass through this cycle, their wives "tend to" exhibit certain personality and character traits; (3) the appellant exhibited some of these character traits specifying particular characteristics;[1] and (4) therefore the appellant's husband had passed through the cycle. As a matter of law, the testimony must be relevant to a material fact[2] and must meet the three tests for expert testimony.[3] In addition, the probative value of the testimony must outweigh its prejudicial impact.[4] The theories presented were quite simple. The

government contended that the abuse by appellant's husband caused emotional pressures to build within her. This emotional crescendo climaxed when he ordered her out of the house. Rather than leave and as a means of revenge, the government contended, she severely wounded him and then, despite his pleas for mercy, shot him between the eyes at close range, and killed him. The appellant claims that her husband lunged at her so she shot him in the stomach; and shortly thereafter, thinking her husband had a gun, she shot the wounded man, killing him. Expert testimony established that the fatal bullet was fired from a distance of twelve to eighteen inches and entered directly between the eyes. With this background, I turn to the propriety of the judge's ruling and the impropriety of the majority's decision to remand.

## II

The trial judge's decision not to admit the expert testimony is supported by the record and, therefore, the decision should be affirmed. Preliminarily, the majority misperceives the gist of the trial court's ruling and understates his awareness of the proffered

---

1. Prompted by the defense attorney, the expert addressed those characteristics of a "battered woman" that the defendant exhibited. She said that the defendant saw her husband "as having two different personalities [and believed] that his nice side [was] going to win out." Further, the expert explained that the defendant had "a lower self-esteem . . . and a lack of confidence," felt that "maybe he would stop," "if she could be a little bit better" in her work for him, "was isolated from friends after her marriage," "did not go out much alone," "was passive and compliant" "did what he told her," "let him be the boss" "was not overtly angry," "felt that she was powerless," and "felt he could do anything." The defense counsel interrupted the expert and asked what effect the defendant's pregnancy had upon her. The expert replied that "*for any pregnant woman*, that is a particularly crucial time." (Emphasis added.) From this point, the expert did not testify concerning the defendant specifically, but only as to abused women in general.

2. *E. g., Reavis v. United States*, D.C.App., 395 A.2d 75, 78 (1978).

3. The tests are listed at page 632 of the majority opinion. *See Dyas v. United States*, D.C. App., 376 A.2d 827, 832 (1977), *quoting* McCor-

mick, Law of Evidence 29–31 (2d ed. 1972, E. Cleary). McCormick explains that unlike other witnesses, experts have no "firsthand knowledge of the situation or transaction at issue." McCormick, *supra* at 29. Only the jury may normally draw inferences from the facts presented at trial. This is the jury's province. An expert, however, may "draw inferences from the facts which a jury would not be competent to draw." *Id.* The three tests demarcate the province of the jury and that of the expert.

4. *E. g., United States v. Green*, 548 F.2d 1261, 1268 (6th Cir. 1977) ("delicate balance between the probative value of [expert] testimony and its capacity to engender vindicative passions within the jury or to confuse the issues"); *Alcorn v. Erasmus*, 484 P.2d 813, 819 (Colo.App. 1971) (error to admit photograph which was probative of material issue because it depicted a disfigured body, which depiction "could have aroused the passions and prejudice of the jury and caused [it] to be distracted from the true issues" of the case). *See* notes 8 and 13 *infra*, for instances in which the trial judge treated undue prejudicial impact.

testimony and the law governing its admission in order to reach the desired result. More importantly, however, the majority misstates the issue regarding *Chenery*[5] and by misapplying the command of the *Chenery* doctrine erroneously decides to remand rather than to affirm. Thus, even assuming that the majority correctly ruled on the *Dyas* tests, we must nevertheless affirm.

A. The Trial Court's Rulings

Contrary to the representations in the majority opinion, the record illustrates that the trial court demonstrated an understanding of the principles of law involved and ruled in accordance with them. I regret the use of this long quotation, but I feel compelled to put the real facts before the reader since the majority has taken liberties with the characterization of the record to reach the desired result. Following the direct examination of the expert, the court inquired of the witness:

THE COURT: When you concluded that Mrs. Ibn-Tamas falls into this category, is this a medical diagnosis on your part of Mrs. Ibn-Tamas?[6]

A. No, it is not an acceptable medical diagnosis. It is a diagnosis, though, that is now beginning to be used in some of the mental health centers. It is also being used by—by the National Institute of Mental Health, and they really have not decided what category they are going to place it in.

It is much like rape. It is now—there is now funding being available. There are now—Congress has a bill before it to appropriate money for it, so it is considered a classification, if you will.

THE COURT: How were the 110 women located and interviewed in connection with this research? What source was there for that?[7]

THE WITNESS: I began the research when I was still on the medical school faculty, so many of my medical school faculty referred women to me when I was there. It also came from community people who knew I was doing the research. When I travel aground the country people who I have made contact with those who are doing work in their field will recruit volunteers for the research.

When I got to Denver, the women came from college referrals, from other local psychologists and medical professionalists, and I often visit women in hospitals if they be hospitalized.

They came from newspaper articles; I have been on television; done some radio shows, so there has been a number of self-referrals, as well. Police have referred, different agencies have referred, so it is a varied source.

THE COURT: Well, then those referred by either physicians or psychologists or persons familiar with the fact that you are engaged in this type of research have been given information by the person, the battered woman, as to her plight?

THE WITNESS: I would imagine that most of those would be in the 60 percent we have talked to.

THE COURT: That sort of disproves the—one of your statements that this is not usually disclosed by a person fitting in this category; doesn't it?

THE WITNESS: No, for many of these women who came through as self-referrals, there were—the statistics that I have, 40 percent have not, in our data, which means that they either saw some information or heard some information someplace else.

For example, one woman came when I gave a workshop at a mental health center.

5. *S.E.C. v. Chenery Corp., supra. See ante* at 634–635.

6. The trial judge appears to have been addressing the first test of *Dyas*, by inquiring as to what profession the subject matter is related. It also might have been a step towards the second test, regarding the witness' "skill, knowledge or experience," because the expert was not a physician.

7. By this question and the next two questions, the judge addressed the third test: "the state of the art" or, as the majority phrases it, "[the expert's] methodology for identifying and studying battered women." *Ante* at 638.

Nobody at the center knew she was being battered. She was on the staff, and so that is how she came through.

Some read it in the newspaper. Everytime I go on TV or make radio calls, radio program, I get numerous calls coming through for some of the research.

So, in some cases, yes, they certainly did. But in others they did not.

THE COURT: Well, in concluding as you do, based on your studies, Mrs. Ibn-Tamas falls into this category of battered women, you are of necessity concluding, are you not, that Dr. Tamas was a batterer; isn't that so? [8]

THE WITNESS: Based on her testimony, and in the same way that I would do it with other battered women; yes.

THE COURT: [Defense Counsel] do you want to tell me why this testimony would not invade the province of the jury? [9]

[DEFENSE COUNSEL]: Yes, Your Honor. It would not invade the province of the jury, Your Honor, because, first of all, the doctor would not be issuing an opinion on the ultimate question here, which is the end of this, February 23, 1976.

What she would be doing is offering testimony in an area not necessarily known to the average person, if you will, of modus operandi, and the type of situation that exists, the syndrome that exists which has a number of facets about it which may be of question to the jury.

And in evaluating the reasonableness of the situation in which Mrs. Ibn-Tamas found herself, I think a jury would be instructed to learn that this is a phenomena

that exists elsewhere, that others' reactions to it can be the same in very many respects, and so for that purpose, falls into the category of modus operandi type of information supplied with an expert who has the source and wherewithal to provide the information, and giving the jury the basis to make the ultimate conclusion on the question before the trial.

THE COURT: Does the Government wish to be heard?

[PROSECUTION]: Your Honor, number one, I am sitting here and I am still a little puzzled as to exactly what the relevance of this testimony is. It seems to me that what [Defense Counsel] wants to do is to, in this witness, assuming you believe everything that Mrs. Ibn-Tamas has testified to about her relationship with her husband, was she a battered wife. The answer is yes.

I suppose that is—I am not sure that that is not an obvious thing, but the trouble, what strikes me is it seems to me the issue of the exact relationship between Dr. Ibn-Tamas and his wife, which is a credibility determination, which the jury is to make, and that it lends—I don't want to say a false error [air?] because I don't mean to impugn the witness, but it lends a misleading error [air?] to have a witness come up and testify under the assumption that everything she said is true, and give the opinion, I suppose—and I am groping here because I am really not quite sure what the relevancy of this testimony is—would give the opinion that yes, she is a battered wife; yes, she has a battering husband.

---

8. As a final inquiry of the witness, the judge inquired concerning a highly inflammatory conclusion and thereby expressed concern over whether the probative value of the proffered evidence would outweigh the prejudicial impact it would have upon the jury. *See* note 4, *supra* and accompanying text. Called as the last defense witness, the expert would rehash the husband's actions and brand them with a professional label. This could not help but rankle the jury and incline its sympathy towards the wife. The jury's natural inclination would be to shift its inquiry from the proper issue, of whether the wife reasonably perceived

herself in danger of imminent serious bodily harm, to the irrelevant issue of whether the wife should be faulted for killing such an overbearing, cruel and physically abusive husband. The judge must strike a "delicate balance between the probative value of this testimony and its capacity to engender vindictive passions within the jury or to confuse the issues." *United States v. Green, supra. See* note 4, *supra.*

9. By inquiring as to this invasion, the court employed a shorthand term to ask counsel to explain why the testimony passed the three *Dyas* test. *See* note 3, *supra.*

Furthermore, if I understand what she said in answer to Your Honor's question, this is not a generally accepted—I don't know whether you call it medical field, or medical specialty, or what, and so if it is not generally accepted, of course, it is generally inadmissible.[10]

And I think it is totally inadmissible.

[DEFENSE COUNSEL]: If I may be heard just briefly.

THE COURT: Yes.

[DEFENSE COUNSEL]: I don't see Dr. Walker as making a medical diagnosis in the situation. I see no more than providing background data that the trier of fact can use in making the ultimate determination.

[The prosecutor] certainly can argue that the validity of her background data rests on information contained in statements by Mrs. Ibn-Tamas. I am not sure how what he said varies from what he said earlier today as to what part of Mrs. Ibn-Tamas' testimony he accepted or didn't. I am not sure he is accepting what happened between the marriage.

But I am not sure she is giving a medical diagnosis, as such. It is important in the nature of background material and identifying attributes for the situation.

THE COURT: Well, in this case, as in any case involving a felony charge and a crime of violence, where self-defense is raised, the law permits evidence of prior violent acts. But this goes beyond those acts which a jury is entitled to hear about, sift, and try to understand the circumstances under which they arose, and draw conclusions therefrom.[11]

With all due respect to the doctor, and undoubtedly, the need for the work which she is engaged in, so that all of us will have a better understanding of the subject, I do not believe the doctor's testimony is admissible. I feel it invades the province of the jury,[12] who are the sole judges of the facts and triers of the credibility of the witnesses, including the defendant, and as I understand it, as an additional reason, the doctor, of necessity, concludes that the decedent was a batterer. And that is not being tried in this case. It is the defendant who is on trial.[13]

I will not permit the witness to testify.

The trial judge thus demonstrated an understanding of the law and of its application. To require him again to go through this exercise and use words more to the liking of the majority does violence to the rule of law.

The majority errs in characterizing the trial court's phrase "invades the province of the jury" as relating only to the first *Dyas* test. *Ante* at 632. Especially in view of the questions that the trial judge posed, it is inescapable that the phrase embraced a summary conclusion regarding all three of the *Dyas* tests.[14] *Compare Lewis v. Firestone*, D.C.Mun.App., 130 A.2d 317, 319 (1957) (expert testimony would "invade the province of the trier of the facts" because it was "wholly conjectural and uncertain") *with Dyas v. United States, supra* at 832 (second test is that expert's "opinion or inference *will probably aid the trier*" of fact (emphasis in original). On the premise that the court's ruling was directed at more than the first *Dyas* test, the trial court's decision must be upheld, even assuming arguendo that the majority's holding on the first test is correct.

**B. The Majority's Misinterpretation of *Chenery***

The majority properly acknowledges that *S.E.C. v. Chenery Corp., supra*, bears upon

10. *Compare* the government's comments *with Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923).

11. The court here ruled that the evidence was irrelevant.

12. *See* notes 3 and 9, *supra*.

13. The third ground for the court's ruling was that the prejudicial impact of the testimony would outweigh its probative value. *See* notes 4 and 8, *supra*.

14. *See* notes 3 and 9, *supra*.

the issue of whether to affirm or remand.[15] The Supreme Court there recognized

> the settled rule that, in reviewing the decision of a lower court, it must be affirmed if the result is correct "although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran*, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 [(1937)]. The reason for this rule is obvious. It would be wasteful to send a case back to a lower court to reinstate a decision which it had already made but which the appellate court concluded should properly be based on another ground within the power of the appellate court to formulate. But it is also familiar appellate procedure that where the correctness of the lower court's decision depends upon a determination of fact which only a jury could make but which has not been made, the appellate court cannot take the place of the jury. [*Id.* 318 U.S. at 88, 63 S.Ct. at 459.]

The District of Columbia expressly adopted this rule shortly after *Chenery* was decided, see *Simpkins v. Brooks*, D.C.Mun.App., 49 A.2d 549 (1946), and has reaffirmed its dedication to the doctrine in the recent past. *See, e. g., Capitol Hill Restoration Society v. Zoning Commission*, D.C.App., 380 A.2d 174, 185 (1977); *Silverstone v. District of Columbia Board of Zoning Adjustment*, D.C.App., 372 A.2d 1286, 1287–88 (1977) (quoting much of the above excerpt); *Morris v. Capitol Furniture & Appliance Co.*, D.C.App., 280 A.2d 775 (1971) (trial court's holding that interest was not usurious upheld although trial court's reason for so holding was erroneous). In other cases we have also adopted the essence of the *Chenery* rule, although not citing *Chenery*. *See, e. g., Duddles v. United States*, D.C.App., 399 A.2d 59, 64–65 (1979); *Randall v. United States*, D.C.App., 353 A.2d 12, 13 (1976) ("court can, of course, affirm the denial of a motion to suppress if, for any reason, the ruling is correct"). Thus, the *Chenery* doctrine is well entrenched in the law of the District.

The *Chenery* rules is fairly simple and straightforward, but has nevertheless been misapplied by the majority. The rule relates to the issue of whether to remand or to affirm in a given situation, depending upon whether the decision-maker is a judge or is a jury. If the decision-maker is a judge, then regardless of the reasoning employed or the law applied to reach the decision, it will be affirmed so long as a plausible ground for affirmance exists. However, where the decision-maker is a jury, then the appellate court must remand for the jury to make the decision, even if a conceivably correct ground for the decision exists. Acting contrary to the simple "well settled" rule of appellate procedure, the majority chooses to proceed as if the decision-maker below were a jury rather than the trial judge.

To the majority, *Chenery* stands for the proposition that it cannot affirm the trial court's decision unless it must affirm the decision as a matter of law. If this interpretation were correct, then it would have been a meaningless exercise for the Supreme Court to outline a different procedure for a court than for a jury because if any decision is required as a matter of law, then it will be made by the appellate court regardless of who the decision-maker would otherwise be.

The clear error of the majority's interpretation may also be seen in its departure from our past decisions. For example, in *Karath v. Generalis*, D.C.App., 277 A.2d 650 (1971), we considered the effect of the trial judge's possibly having improperly failed to consider a union rule in holding for the plaintiff-appellee. In that case we held:

> Under the doctrine of *Securities and Exchange Commission v. Chenery Corporation*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), it is not necessary for a trial court to make findings, and if the record discloses some valid ground for supporting its judgment, it should not be disturbed on appeal. Our review of the record impels the conclusion that the trial judge on the evidence before him *could*

---

**15.** All agree that there is no basis in the record to reverse.

have determined that, assuming the rule was proper, proof of appellee's violation of the rule was lacking.

\* \* \* \* \* \*

Accordingly, although it might have been within the province of the trial judge to have found otherwise, we cannot say that on this evidence, the trial judge erred . . . . [*Id.* at 653 (emphasis added).] Thus, by employing the correct rule of law, we held that the trial court "could" have reached the decision that it did. We also held that the decision reached was not required as a matter of law. Nevertheless, because a plausible reason existed to sustain the trial court's decision to hold for the appellee, his decision must be affirmed. Under the rule now advanced by the majority, of course, we would remand in such a situation.

Whereas in *Karath* the decision of the trial court was to hold for the plaintiff, the decision of the trial court in *Harper v. Wyatt,* D.C.App., 281 A.2d 442 (1971), was to allow certain counterclaims. Citing *Chenery,* we held that "if the record discloses some valid ground for supporting [the trial judge's] conclusion, an appellate court should allow it to stand." *Id.* at 444 n. 2. Applying *Chenery,* we found that there was testimony on the record to "[support] the action of the court in granting the counterclaim . . . ." *Id.* at 444. It is important to note that we did not hold that the testimony compelled granting the counterclaim as a matter of law, but only that it "[supported]" the counterclaim.[16]

The correct interpretation of *Chenery* applied to this case compels affirmance rather than remand. The majority concedes that the trial court's decision to exclude the testimony could be sustained under either the second or third of the *Dyas* tests. By its decision to remand, the majority is holding that the decision to exclude the testimony is "within the province of the trial judge."

*Karath v. Generalis, supra* at 653. Therefore, because the decision was for the trial court, rather than for the jury, and because all agree that either of the last two *Dyas* tests would provide a basis to support the decision to exclude the expert testimony, the decision of the trial court should be affirmed under *Chenery* and its progeny, especially *Karath* and *Harper. See M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

Specifically applied to the law of evidence, the *Chenery* rule has been advocated by the leading authorities in the field. Professor Wigmore states:

[W]hen a general objection is *sustained* [emphasis in original] by the trial court, it may be presumed that some valid ground was apparent to the judge without express statement; and as the exception is here to be taken by the proponent of the evidence, it is fair to insist that he should have asked for the specific ground of objection, if he did not perceive it; or should have made an offer to obviate it, if he did perceive it; or should have stated clearly the precise basis of his claim for admissibility, if he had rested on any specific ground. Hence, the general objection will suffice, on appeal by the proponent of the evidence, if on the face of the evidence and the rest of the case there appears to be *any ground of objection which might have been valid* (or, otherwise stated, if there is any purpose for which the evidence *would conceivably be inadmissible*) . . . . [Emphasis added.]

\* \* \* \* \* \*

So, too, a specific objection *sustained* [emphasis in original] (like a general objection) is sufficient, though naming an untenable ground, *if some other tenable one existed.* [Emphasis added.] [1 J. Wigmore, Evidence 338, 342 (3rd ed. 1940) (footnotes omitted).][17]

---

16. By contrast, we held with regard to another issue in the same case that the court's decision would be reversed because "[t]here [was] no testimony . . . to support" it. *Harper v. Wyatt, supra* at 444.

17. This rudimentary principle has also been stated thus:

And if the trial judge *sustains* a general objection, the upper court is . . . charita-

Particularly the emphasized portions of the quotation illustrate the fault of the majority's ruling. By remanding for the trial court to rule again on the proffer, the majority concedes that both the second or third *Dyas* tests are "[grounds] of objection which might have been valid." *Id.* The evidence might "conceivably be inadmissible" under either ground and either test is a "tenable one" for excluding the testimony. *Id.* Moreover, casting a distinction on "discretionary judgment" grounds as the majority does, *ante* at 636 n. 17, is bootless since the proffered testimony was otherwise correctly excluded as irrelevant to any material issue in the case. *See* Part III, *infra.* Accordingly, we are bound to affirm the decision to exclude the evidence.

### III

Contrary to the majority's holding, the proffered testimony is inadmissible as a matter of law. The evidence was irrelevant and failed to meet two of the tests for expert testimony.

The majority concludes that the testimony was relevant as a matter of law because it rebutted the government's argument that "a woman who was truly frightened by her husband . . . would have . . . call[ed] the police . . . or [left] him." *Ante* at 633–634. The meager support of two questions from the record quoted by the majority belies the majority's conclusion that the government made this argument. *Id.* n. 14. I will assume for the moment

that the "argument" was made, if the majority contends (and it is not at all clear) that the expert should have been allowed for credibility purposes to bolster the appellant's impeached testimony, then it errs because rehabilitation on such an obscure point should not be allowed by extrinsic evidence. *See, e. g.,* McCormick, Law of Evidence 97–100 (2d ed. 1972, E. Cleary). On the other hand, if the majority asserts that this testimony should have been allowed as substantive proof, on the issue of whether a woman "truly frightened" of her husband would call the police or leave him, then it is mistaken because that issue is immaterial. Indeed, in examining the entire proffer, no portion of the testimony tends to make the existence of any material fact more or less likely; none is probative of whether the appellant reasonably believed herself in danger of imminent serious bodily injury at the time she shot her husband.[18] For example, the expert's opinion—that the appellant had "a lower self esteem . . . and a lack of confidence," felt "maybe he would stop," "did not go out much alone," "was passive and compliant," "did what he told her" and "let him be the boss"[19]—had no bearing on whether the appellant perceived herself in imminent danger when she shot her wounded husband. The testimony which comes the closest to being relevant was that "she felt she was powerless . . . . She felt he could do anything." This could arguably

---

ble toward his ruling. "When evidence is *excluded* upon a mere general objection, the ruling will be upheld, if any ground in fact existed for the exclusion. It will be assumed, in the absence of any request by the opposing party or the court to make the objection definite, that it was understood, and that the ruling was placed upon the right ground.
\* \* \* \* \* \*
However, if a specific objection is made on an untenable ground and sustained, it seems that if there were another valid ground for exclusion, the ruling should be upheld . . . [McCormick, Law of Evidence 116 & n. 61, *supra*, (emphasis in original).]

18. *See generally* note 1, *supra.* The portion of the transcript quoted by the majority, related to events in Miami two to four years before the shooting. Further, the majority states that rel-

evant portions of the expert's testimony include opinions that women in the appellant's situation "typically are low in self esteem, feel powerless, and have few close friends." *Ante* at 634. I fail to understand how these opinions make it more or less likely that the appellant reasonably perceived herself in danger of imminent serious bodily injury. By comparing the expert's opinions, *see* note 1, *supra*, with the facts and the defense the appellant sought to establish, it is readily seen that expert testimony is not probative. The trial court should use extreme care "to screen 'background' evidence which may be capable of subliminally inciting or confusing the jury." *United States v. Green, supra* at 1270 n. 4.

19. *See* notes 1 and 15, *supra.*

have been interpreted to mean: "She always felt that he was capable of killing her." While arguably relevant, however, this is an improper subject for expert testimony, given the facts and the theories of this case.

To be proper for expert testimony, the subject must be "beyond the ken of the average layman." *Ante* at 633. The only arguably relevant portion of the testimony fails the test. One need not be an expert to conclude that if all the appellant's recited events actually occurred, she would believe that her husband was capable of causing her further serious bodily injury or death. In addition to the appellant's testimony regarding her husband's physical abuse, she testified that her husband had actually threatened to kill her on at least two occasions. Consequently, the only arguably relevant portion of the testimony should be excluded as not being beyond lay understanding.

The majority relies solely on *Hearst I* for the proposition that the "beyond the ken" test is met as a matter of law. *Hearst I*, a trial court decision, does not stand for this proposition. In *Hearst I*, the trial court expressly relied upon its discretion to exclude or allow the testimony: "While the [trial] Court is mindful that the Ninth Circuit has generally upheld trial court decisions rejecting psychiatric testimony [in cases such as the present], *see e. g., United States v. Haseltine*, 419 F.2d 579, 581 (9th Cir. 1969), it is equally aware of its discretionary authority to allow such testimony . . . ." 412 F.Supp. at 891. *Haseltine*, which was cited in *Hearst I*, is more closely aligned with this case than is *Hearst I*.[20] Charged with willfully failing to file federal income tax returns, Haseltine contended "that his failure to file was the product of psychological and emotional pressures rather than of a purpose to avoid payment of the tax." 419 F.2d at 580. His proffer of expert testimony was very similar to that of appellant's.[21] Although the appellant's expert was a psychologist who therefore did not offer a medical diagnosis, and Haseltine's witness was a psychiatrist, numerous factors square the testimony proffered by Mr. Haseltine and the appellant. Each expert had a "buzz word" for the accused person: Haseltine was termed a "compulsive neurotic;" the appellant was described as a "battered wife." Each expert was to testify concerning the state of mind of the defendant. Both experts would state that the state of mind was caused, at least in part, by serious marital discord. In each

---

**20.** Contrary to the majority's claim, the appellant's proffered expert testimony is not analogous to the testimony in *United States v. Hearst*, 412 F.Supp. 889, 890 (N.D.Cal.1976) (*Hearst I*). The issue in *Hearst I* was whether "the effects of kidnapping, prolonged incarceration, and psychological and physical abuse" deprived the defendant of a general intent to commit the alleged crimes, *i. e.*, whether the defendant was coerced. 412 F.Supp. at 890. Two aspects distinguish this issue from that of the present case. The average layman is far better positioned to determine whether a defendant did or did not fear for her safety than whether a defendant did or did not act of her own free will. Furthermore, whereas laymen are generally acquainted with inter-spousal conflicts and the effect of these conflicts upon the persons involved, they are not generally acquainted with kidnapping followed by prolonged incarceration coupled with psychological and physical abuse and their resultant effect on the victim.

**21.** The proffer was:
  He [the psychiatrist] is personally aware of the tempestuous divorce and he is personally aware of Mr. Haseltine's business failure. He is able, on the basis of his professional observation, to form an opinion. That opinion is that Mr. Haseltine is a compulsive neurotic. His own observations—which were not disclosed to him by Mr. Haseltine—are that Mr. Haseltine is punctilious and meticulous to an excessive degree in any of his behavior patterns, and that as a consequence it was extremely difficult for this man to surmount the psychological obstacle of not having all of his records, and that this coupled with the state of total distraction occasioned by the divorce and the state of depression caused by the loss of his formerly flourishing business provided a stumbling block which this man was unable to overcome until certain problems had been resolved, such as the reavailability to him of records, the cessation of the divorce." . . . The doctor would further testify that it was not "mentally possible for Mr. Haseltine to complete and file tax returns for the years [in question]." [419 F.2d at 580–81 n. 2.]

case the trial court, exercising its discretion, rejected the testimony. In *Haseltine*, the circuit court affirmed, as we should here, notwithstanding the trial court's exercise of discretion in permitting testimony in *Hearst I*.

The appellant, as the proponent of the testimony, also failed as a matter of law to establish the acceptance required by *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923). Employing the government's contention regarding *Frye* as a smokescreen, the majority concludes that the appellant must show that there is "general acceptance of [the expert's] particular methodology," *ante* at 638, yet curiously fails to indicate that there is any evidence in the record concerning the "general acceptance" of the expert's "methodology for identifying and studying battered women." *Ante* at 638. As the record is utterly devoid of evidence concerning the "general acceptance" of the "methodology" *Dyas'* third test was not met and the testimony was inadmissible as a matter of law.

As to her method for examining or interviewing Mrs. Ibn-Tamas and analyzing her situation, the record reveals only that the expert "had contact" with her. No other indication is made. We learned from the witness that her opinion was going to be based upon a paltry universe of 110 other women who were "researched" by her. We know nothing of these few women other than their apparent claim of being abused. Nothing was said of the techniques for "interviewing," the duration of the interview, the number of times each woman was interviewed or any follow-up. The expert interviewed only the abused women and not their husbands, physicians or family. She even testified that "*we* have talked to" some 60 percent of the abused women referred by others (emphasis added). When questioned by the court, the witness candidly acknowledged that 40 percent of the women apparently were prompted to seek an interview by newspapers, television or radio. No estimated potential margin for error was expressed. The foundation for the testimony is patently inadequate, as there was no indication in the record of what method the expert employed or that the expert's method was generally accepted in the field. *See Brown v. United States*, D.C.App., 384 A.2d 647, 649–50 (1978).

I would affirm the conviction and leave to another day and an appropriate case the decision whether a clinical psychologist can reliably aid the average layman in understanding specific behavior by categorizing the person as abused, whether physically, economically or culturally.[22]

---

**22.** In my view, the impeachment issue does not rise to the level of reversible error.