The People of the State of Illinois, Plaintiff-Appellee, *v.* James Albert Kennedy, Defendant-Appellant.

(No. 12986; <span style="background:black">       </span>

Fourth District—December 4, 1975.

Richard J. Wilson and Joshua Sachs, both of State Appellate Defender's Office, of Springfield, for appellant.

C. Joseph Cavanagh, State's Attorney, of Springfield (G. Michael Prall, of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE SIMKINS delivered the opinion of the court:

Defendant-appellant, James Albert Kennedy, was charged in two complaints, with the offense of disorderly conduct as that offense is defined in section 26—1(a)(4) of the Criminal Code (Ill. Rev. Stat. 1973, ch. 38, § 26—1(a)(4)). Specifically the complaints alleged that the defendant relayed false bomb threats to the Illinois State Police by means of telephone calls made on August 8 and 9, 1974. Defendant was tried before a jury which returned a verdict of guilty. He was sentenced to

364 days in the Illinois State Farm at Vandalia. He was received at that institution on October 7, 1974, and his sentence expired on April 22, 1975. The case was submitted to this court on oral arguments heard October 3, 1975. We reverse and remand for new trial.

State Trooper Maurice Suits received a telephone call at State Police Headquarters on August 8, 1974. The caller "* * * a male subject, kind of heavy voice, * * *" said that four sticks of dynamite were supposed to go off at the Centennial Building at 4 P.M. The caller then hung up. The Centennial Building was evacuated; a search revealed no bomb, and no explosion occurred.

On August 9, 1974, Linda Perkins, a police clerk at State Police Headquarters received a call from a man who stated that "* * * yesterday at 3:30 the clock stopped at the Centennial Building and he rewound it. There will be a bang today at 4:00 o'clock, ha, ha, ha, ha." At this point the caller terminated the call. Again the building was evacuated; a search revealed no bomb, and no explosion occurred.

State Police Headquarters in Springfield has a permanently installed tape recorder which records all incoming calls on certain lines. Both of the foregoing calls were recorded. The calls were then rerecorded on a small, portable cassette. On August 19, 1974, two members of the State Police, Andrew Planitz and John Davis took the copy tape to the Centennial Building for the purpose of securing identification of the caller's voice. They began on the fourth floor for no particular reason. The two officers gathered together a group of eight supervisors, played the tape for the entire group, and requested that anyone who recognized the voice come up separately and inform the officers. Four of the supervisors made no identification. Four others, Norman Michael, Kenneth Dash, Ray Cundiff and Phyllis Freeman identified the voice as that of the defendant. None of the eight suggested any name other than the defendant's. The tape was also played for persons employed in the truck reciprocity office on the fourth floor of the Centennial Building. None of these individuals recognized the voice. On August 21, Officer Davis played the tape for persons employed in the Department of Personnel and three of those individuals identified the voice as that of the defendant, none of the persons in that department suggested any name other than that of the defendant. Defendant worked on the fourth floor of the Centennial Building.

On August 22, 1974, Planitz and Davis went to the Centennial Building and placed the defendant under arrest. The officers told the defendant what he was being charged with. He was then taken to an office in the Centennial Building where Planitz, Davis and Mr. Fahey, an investigator for the Secretary of State were present. Defendant was

given the *Miranda* warnings, which were read to him. Davis testified specifically that the defendant was advised that he had a right to remain silent, that anything he said could and would be used against him in a court of law, that he had a right to have a lawyer present while he was being questioned, and that if he could not afford a lawyer one would be appointed for him. The defendant then indicated that he understood his rights and that he did choose to talk to the officers about the matter. The officers asked defendant to cooperate in solving the bomb threat problem, played the tape for him and asked him to submit to the making of a voice sample to be recorded on a portable tape recorder. Davis had written down the words of the bomb threat call "* * * in rough words" and pushed the paper towards defendant and was going to ask defendant to read those words in making the voice sample. At trial the Assistant State's Attorney put the following questions to Davis and elicited the indicated responses:

"Q. Had you gotten to that point? Had you asked him to read those words?

A. I completed writing that and asked him to talk into the microphone and he refused * * *

Q. * * * What, if anything, did you do with regard to Mr. Kennedy on that occasion?

A. We had Mr. Kennedy come into the office and we talked to him. We played the tape for him and asked his cooperation in solving this problem we was having of these bomb threats and gave him the *Miranda* warning and asked for a tape recording to be made of his voice at which time after giving him the *Miranda* warning he acknowledged he knew what it was, and that he would cooperate with us and when we asked him to submit to a sample of his voice on tape recording he refused to give it and stated that he prefered to talk to a lawyer."

No objection was made to either question, and no motion to strike the answers was made.

Officer Planitz, having testified that he and Davis had placed the defendant under arrest, testified as follows in response to questions asked by the Assistant State's Attorney.

"Q. Was any conversation had with him at that time?

A. Yes, there was.

Q. Can you relay that conversation, please?

A. We advised him of the nature of the charge against him and then we went to Mr. Mills office, myself, Agent Davis and Mr. Fahey, that's a Secretary of State's investigator. We played the recording for him and asked if he would consult [*sic*] to mak-

ing a recording of his voice there for us so we could compare the two.

Q. What happened?

MR. RAY: Objection to that, Your Honor.

THE COURT: And what's the basis for the objection?

MR. RAY: I believe it would be a violation of my client's constitutional rights.

THE COURT: Objection overruled.

MISS SCOTT: Q. Sir, what happened?

A. We asked him to make a recording for us. He turned his head to the side and placed his hand in front of him like that so he wouldn't talk into the tape recorder.

Q. Did you have any further verbal conversation with him after that?

A. No, he advised that he would like to have his services of an attorney, and we took him to the Sheriff's department and from there to the courtroom before the judge."

The defendant offered no evidence, and it appears that following defendant's refusal to give a voice sample during interrogation by the officers no further effort to secure a sample was made by the State nor was defendant requested to speak in front of the jury for that purpose. In opening final argument to the jury the Assistant State's Attorney made, without objection, the following statement.

"He played the tape for Mr. Kennedy, asked him if he would cooperate, asked him if he would provide a voice sample. He stated—Mr. Kennedy put his hand over the microphone and shook his head. Mr. Kennedy was then arrested."

In his argument to the jury defense counsel stated:

"Now, here's Mr. Kennedy being interviewed by two police officers, and they wanted him to make a tape recording of the exact words that were in the threat. He declined to do so."

In final argument to the jury the Assistant State's Attorney stated:

"Mr. Ray has commented that the defendant was asked to make a recording of the exact words on the bomb threat. Well, now, the testimony of Mr. Planitz and Mr. Davis was that first he was asked that if he would give a voice recording at all. Davis was writing the words out, yes, maybe that's what he thought, I am going to have to say those same words, but the question here was whose voice was it not what words were said. Consider a course of conduct consistent with innocence. Consider the course of conduct pursued. Weigh the evidence and return the verdict

you think is proper in this matter and none of us will have any fault with you."

It is the foregoing testimony and final argument which gives rise to defendant's first assignment of error. He argues that it was plain error to admit evidence that he refused to give a voice sample and requested an attorney after being arrested and given the *Miranda* warnings.

The People urge that the point is not available to defendant because of his failure to make specific objection to the testimony of Officer Planitz, no objection to the testimony of Officer Davis, no objection to the remarks of the Assistant State's Attorney made in closing argument, and failed to mention the point in his post-trial motion. However, Supreme Court Rule 615 (Ill. Rev. Stat. 1973, ch. 110A, § 615) authorizes us to notice plain errors or defects "* * * affecting substantial rights * * *" although they were not brought to the attention of the trial court.

The testimony which advised the jury that defendant had demanded counsel was clearly prejudicial to defendant, and the closing argument of the Assistant State's Attorney which requested the jury to "[c]onsider the course of conduct pursued" may well have directed the jury's attention to the demand for counsel. Proof that an accused consulted with an attorney on the day following the incident which gave rise to a formal charge of criminal activity, required reversal and remand in *United States ex rel. Macon v. Yeager*, 476 F.2d 613 (3rd Cir. 1973). In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), the court, in discussing a defendant's right to remain silent, held that the prosecution may not "* * * use at trial the fact that [the defendant] stood mute or claimed his privilege in the face of accusation." The court went on to hold that the right to consult with a lawyer and to have the lawyer with him during interrogation was indispensible to the protection of 5th amendment rights. The rules enunciated in *Miranda* apply "* * * when the individual is first subjected to police interrogation while in custody * * *."

■■ In *Griffin v. California*, 380 U.S. 609, 14 L.Ed.2d 106, 85 S.Ct. 1229 (1965) the court held that comment on the exercise of 5th amendment rights is constitutionally impermissible, and that such comment serves to cut down on the privilege by making its assertion costly. Under the rationale of *Griffin* it seems clear that comment upon the exercise of the right to counsel, founded not on the sixth amendment, but rather upon necessity to protect fifth amendment rights, is constitutionally impermissible since that too, would directly serve to cut down, and make costly, the assertion of fifth amendment rights. We hold that proof of

defendant's demand for counsel constituted prejudicial and reversible error.

The defendant does not contend that his fifth amendment rights extend to the giving of a voice exemplar, and the People agree. This view is supported by *United States v. Dionisio*, 410 U.S. 1, 35 L.Ed.2d 67, 93 S.Ct. 764 (1973) which held that the giving of a voice exemplar was not violative of a fifth amendment right since it was not of testimonial quality or character. The People argue that since the giving of a voice sample does not constitute self-incrimination defendant's refusal to do so was properly put before the jury as an admission.

To assert, however, that because the giving of a voice exemplar may be required of a defendant, his refusal to do so may be proven as an admission is to state a proposition with which we do not agree. Defendant had been arrested, and was in custody when the officers began their interrogation. He had been expressly advised of his right to remain silent and that anything he said could be used against him. There is no suggestion that he was told that his silence, as well as anything that he might say, could be so used. It is unreasonable to expect that a defendant would be aware of the legal distinction between words testimonial in character, and those not constitutionally protected. Defendant's refusal to speak under these circumstances may well have been an exercise of his right to remain silent which the officers had conveyed to him without qualification. It is also true that defendant's silence under these circumstances cannot be said to have sufficient probative value (if indeed, it has any) to warrant its submission to the jury as evidence from which it could be permitted to infer that defendant's silence was indicative that he felt that the voice sample would tend to establish his guilt. *People v. Ellis*, 65 Cal.2d 529, 421 P.2d 393, 55 Cal. Rptr. 385 (1966), deals with this issue and reaches a conclusion with which we agree. The People direct our attention to the dissenting opinions in *Ellis*, but we do not consider them to be persuasive.

The proposition that the officers may advise defendant that he has an unqualified right to remain silent, and to then permit the State to utilize a defendant's silence under the circumstances here present, does not comport with a sense of fundamental fairness. The proof of silence, and the closing argument calling attention to that "course of conduct" was highly prejudicial, and requires us to reverse and remand. We also note that the identification of defendant's voice was the only substantial evidence connecting him with the crime.

■■ Defendant also maintains that his guilt was not established beyond a reasonable doubt. There is no merit to this contention. Identification by voice is permissible. (*People v. Nelson*, 127 Ill.App.2d 238, 262 N.E.

2d 225 (1970); *People v. Finney*, 88 Ill.App.2d 204, 232 N.E.2d 247 (1967).) Several witnesses made positive identification of defendant's voice, and the record demonstrates that they were coworkers and had adequate opportunity to have become familiar with his voice, its quality, inflection and with his laugh.

For the foregoing reasons the judgment is reversed and the cause remanded for a new trial.

CRAVEN and GREEN, JJ., concur.