SECOND DIVISION
September 5, 2006

No. 1-04-1360

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| ARTHUR SHANKLIN, | ) | Honorable |
| | ) | Colleen McSweeney |
| | ) | Moore, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE WOLFSON delivered the opinion of the court:

Ronald Coverson was shot several times as he stood outside of his car on the early morning of December 20, 2001. The main evidence presented against the defendant Arthur Shanklin was (1) the testimony of Coverson's girlfriend, Candice Hibbler, who was present when the murder occurred and identified the defendant in a photographic array and a lineup, and (2) a 9-millimeter handgun used in the murder recovered from the defendant's possession following his arrest.

Following a jury trial, the defendant was convicted of the first degree murder of Coverson. He was sentenced to a prison term of 35 years and given an additional 20-year sentence for using a firearm in the murder.

The defendant contends on appeal that: (1) the trial court erred in denying his motion to suppress the seized handgun; (2)

the evidence was insufficient to prove his guilt beyond a reasonable doubt; (3) numerous comments in the prosecution's closing and rebuttal arguments amounted to misconduct that denied him a fair trial; (4) the introduction of evidence of his refusal to participate in a lineup denied him a fair trial; and (5) his 20-year sentencing add-on violates the Illinois Constitution.  We find the handgun should have been suppressed.  For that reason, we reverse the defendant's conviction and sentence, and we remand for a new trial.

FACTS

Before trial, the defendant filed a motion to suppress the 9-millimeter handgun as a fruit of an unlawful arrest.  At the suppression hearing, Ruby Evans, the defendant's grandmother, testified that on January 7, 2002, police detectives arrived at her home at 7221 South Union Street and knocked on her door.  When she answered, the detectives identified themselves and asked for the defendant.  Although Evans told the detectives "wait, let me see if he is in," the detectives walked past her and to the second floor of her home without her permission.  Evans did not accompany the detectives upstairs.

A detective returned downstairs 10 minutes later, informed Evans that the defendant had a gun, and told her that if she signed a piece of paper he was holding she would not be held

2

responsible for it.  Evans signed the paper without reading it.[1]

Chicago police detective Dean Claeson testified he had been investigating Coverson's December 20, 2001, shooting death and had interviewed Hibbler, an eyewitness to the murder, at approximately 9 a.m. on January 7, 2002, when she identified the defendant's photograph from an array.  Claeson, who knew the murder weapon had not been recovered, went with four other officers to 7221 South Union, the defendant's last known address, at approximately 10:30 a.m. to arrest him.  He did not obtain a search or arrest warrant.

---

[1] A second gun, which was introduced for aggravation purposes at the defendant's sentencing hearing, was recovered after a consent-to-search form was signed.

Claeson spoke to Evans when she opened the door, identified himself, and informed her he was looking for the defendant. After Evans let them inside, Claeson asked where the defendant was. Evans told him the defendant may have been upstairs and that they could go look if they so desired. Claeson and two other officers went upstairs where they found the defendant in bed. When the officers identified themselves, the defendant began reaching for something. Claeson arrested the defendant and recovered a 9-millimeter handgun from between the bed and the wall near where the defendant was reaching. As the defendant was being taken to the station, Claeson asked Evans to sign a consent-to-search form. Evans read the form to herself and signed it. Evans was not told she could be held responsible for the gun if she refused to sign the form.

The trial court denied the defendant's motion, finding exigent circumstances permitted his warrantless arrest and the police had a right to conduct a cursory search for safety purposes. Therefore, the 9-millimeter gun was properly recovered. The court specifically found that "Mrs. Evans' testimony was credible but, actually, not relevant to the issues before [it], because she was not upstairs."

It was established at trial that Hibbler, a student at Northern Illinois University, was with Coverson in the early

4

morning of December 20, 2001, visiting a house located near 71st and Green Streets in Chicago. Coverson "cooked" drugs in the kitchen, an activity Hibbler had seen him do before. Coverson then gave two bags, a blue Gap bag and a clear sandwich bag, to Hibbler. Hibbler did not look inside the Gap bag, but recognized drugs in the sandwich bag. Hibbler and Coverson then left with Hibbler carrying the bags.

Although Hibbler testified at trial that she had never been to that house before, her prior testimony to the grand jury indicated she had been there in June or July of 2001. She told the jury she had been to the block before, but never inside the house.

Hibbler followed Coverson out of the house toward Coverson's car, a four-door silver Jaguar parked on the street. As Hibbler was about to close the passenger door, she looked to her left and saw two men standing outside the driver's side of the car. One man wore a black "puff coat" and pointed a black gun into the car. The other man wore an orange down coat. Neither man wore gloves.

Hibbler identified the defendant as the man in the black coat. She said several times that she was able to see his face. The man in the orange coat had not been identified as of the time of the defendant's trial.

Coverson threw up his hands and said, "I'm getting out." While Hibbler testified at trial that "someone" then opened the driver's door and Coverson exited the car, she previously told the grand jury that "the guy with the black coat opened up [Coverson's] car door." Hibbler also exited the car. The defendant then grabbed Coverson from behind. Hibbler could still see the defendant's face because he was "a little taller" than Coverson, who was five feet, eight inches tall. The man in the orange coat came around to the passenger side of the car, grabbed the Gap bag from Hibbler, and returned to the driver's side. The defendant tried to pull Coverson toward the back seat of the car and somebody told Hibbler to get into it.

Hibbler began entering the car when Coverson told her not to. Coverson then broke loose from the defendant and started to scream. Hibbler also began to scream. Then she heard gunshots. After seeing Coverson hit the ground, Hibbler turned around, closed her eyes, and stopped screaming. Although Hibbler testified at trial that she saw the shooting, she told the grand jury that her head was down and her eyes were closed when shots were fired. When the gunshots ceased, Hibbler turned around and saw Coverson lying in the street. She also saw the offenders running north on Green Street. According to Hibbler, the entire incident took place over three to six minutes.

Hibbler returned to the house they had been at and gave the sandwich bag of drugs to an individual named "G," whose wife called 911. Hibbler, who testified she did not consider herself to be good at measuring heights and weights, spoke to detectives and described the offender in the black coat. She first told detectives he was a black male 20 to 25 years of age between five feet, seven inches and five feet, eight inches tall, weighing between 160 and 170 pounds, with a medium complexion. She later described him as 20 to 28 years old weighing between 150 and 170 pounds. Hibbler could not remember if he had facial hair. According to Detective Claeson, who was investigating the murder, Hibbler "appeared to be extremely distraught." Hibbler did not tell the police about the drugs.

Coverson, who received multiple gunshot wounds to his head, legs, and groin, died at the scene. Evidence technician Gerald Reid recovered and inventoried numerous 9-millimeter and .45-caliber cartridge cases and metal fragments from the murder scene, as well as one fired bullet. Reid did not dust Coverson's Jaguar for fingerprints.

On January 6, 2002, Detective Claeson spoke to an individual claiming to have information about Coverson's death. Claeson then located the defendant's photograph. After sending other officers to locate Hibbler, Claeson went off-duty.

At approximately 6 a.m. the following day, January 7, 2002, Hibbler was taken to the station and, after retaining counsel, informed the police about the drugs. She also viewed a photographic array including a photograph of the defendant. She told Detective Claeson that one picture looked like an old picture of the man in the black coat. Claeson then showed her a more current photo of the defendant. She identified the defendant. Hibbler signed the first photograph, but not the second. Hibbler also identified a "filler" photo as being the individual in the orange coat.

Detective Claeson then went to the defendant's home, arrested him, and recovered a High Point 9-millimeter semiautomatic pistol loaded with eight rounds from between the defendant's bed and the wall. Forensic testing revealed that, to a reasonable degree of scientific certainty, the 9-millimeter cartridge cases and bullet recovered from the scene of Coverson's murder matched the 9-millimeter handgun recovered from the defendant. Although the gun, its magazine and the eight rounds were tested for fingerprints, no suitable latent impressions were found.

At the police station, Claeson told the defendant that he was going to take part in a lineup, but the defendant "repeatedly stated he wasn't going to be in a line-up." After being informed

8

he did not have a choice, the defendant stood in a lineup and was identified by Hibbler.

On January 29, 2002, Hibbler viewed a photographic array and tentatively identified the second offender. However, when she viewed a lineup several days later, she could not identify anyone because she "wasn't 100 percent sure."

The defendant presented testimony from Ruby Evans, his grandmother; Christopher Flunder, his friend of 14 years; Iana Moore, the wife of his cousin; and Rosie Shanklin, his mother.

Evans and Shanklin testified that the defendant, who was between six feet, two inches and six feet, four inches tall, had facial hair, including a beard, moustache, and sideburns, as of December 30, 2001.

According to Flunder, the defendant purchased the 9-millimeter pistol on December 25, 2001, after Coverson's murder, from an individual named "Wild." Flunder saw the defendant fire the gun on December 31, 2001, in celebration of the new year.

Moore, who lived on Green Street a few houses south of where the murder occurred, testified that she heard gunshots in the late evening of December 19 or the early morning of December 20, 2001. She looked out her bedroom window and saw a woman screaming and two individuals running away. Of the two individuals, she could only see the one wearing black, whom she

9

described as short. She did not see the defendant. Moore did not give this information to the police previously because she lived in a "[h]orrible neighborhood" and was afraid.

The parties then made their closing arguments. After receiving instructions from the court and deliberating, the jury returned a verdict finding the defendant guilty of murder. The court imposed a prison term of 35 years, tacking on an additional 20 years because a gun was fired.

DECISION

I. Motion to Suppress

The defendant first contends the trial court erred in denying his motion to suppress the 9-millimeter handgun as a fruit of his warrantless arrest because Ruby Evans did not give the detectives consent to enter the home and because no exigent circumstances existed.

When reviewing a trial court's ruling on a motion to suppress, the court's factual findings are reviewed for manifest error while the court's ultimate ruling is reviewed de novo. People v. Pitman, 211 Ill. 2d 502, 512, 813 N.E.2d 93 (2004).

As a general rule, a warrant is required to support the nonexigent, nonconsensual entry into a private residence for the purpose of making a felony arrest. Payton v. New York, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980); People v. Abney,

81 Ill. 2d 159, 166, 407 N.E.2d 543 (1980).  That is, the police need either a warrant or probable cause coupled with exigent circumstances to lawfully enter a private residence and effectuate an arrest.  In re D.W., 341 Ill. App. 3d 517, 529, 793 N.E.2d 46 (2003).

Our supreme court has set forth the following factors as relevant to a determination of whether an exigency exists: (1) whether the crime was recently committed; (2) whether there was any deliberate or unjustified delay on the part of law enforcement during which a warrant may have been obtained; (3) whether the crime was grave; (4) whether there was a reasonable belief that the suspect was armed; (5) whether the police were acting on a clear showing of probable cause; (6) whether there was a likelihood that the suspect would avoid arrest if not swiftly apprehended; (7) whether there was a strong reason to believe that the suspect was in the premises; and (8) whether the entry was made peaceably, albeit without consent.  People v. McNeal, 175 Ill. 2d 335, 345, 677 N.E.2d 841 (1997); People v. Williams, 161 Ill. 2d 1, 26, 641 N.E.2d 296 (1994); People v. White, 117 Ill. 2d 194, 216-17, 512 N.E.2d 677 (1987).  Although these factors are relevant to the court's determination, they are meant only to serve as guidelines and each case must be decided on its own facts after considering the totality of the

circumstances. McNeal, 175 Ill. 2d at 345-46; Williams, 161 Ill. 2d at 26. The fundamental guiding principle is the reasonableness of the officers' conduct. McNeal, 175 Ill. 2d at 345.

The trial court believed Ruby Evans--the entry into the Evans' home was nonconsensual. The police did not have an arrest or search warrant when they entered the house uninvited and walked up the stairs to the defendant's bedroom. Those findings by the trial court are not against the manifest weight of the evidence. The remaining issue is whether exigent circumstances justified the arrest and seizure.

The defendant's right to be free from governmental intrusion into his own home is "at the very core of the fourth amendment." Payton, 445 U.S. at 589-90. To justify a warrantless entry, the circumstances must "militate against delay and justify the officers' decision to proceed without a warrant." Abney, 81 Ill. 2d at 168-69. We do not see those circumstances in this record.

The murder occurred on December 20, 2001. Police officers interviewed Candice Hibbler at about 9 a.m. on Monday, January 7, 2002. That interview apparently established probable cause to arrest the defendant. Police officers arrived at the Evans' home at 10:30 a.m. or 11 a.m. They made no attempt to obtain an arrest or search warrant.

Detective Claeson, the only police officer who testified at the suppression hearing, did not attempt to explain the failure to obtain a warrant. Certainly, several judges were available to the officers on a Monday morning in Chicago. Nor did Claeson testify he had any reason to believe the defendant posed a danger to the arresting officers. There was no evidence the defendant had been seen with a weapon during the seventeen days since the shooting. The offense had not been recently committed. See Abney, 81 Ill. 2d at 159. And there was no evidence the defendant would escape if he were not swiftly apprehended. See People v. Yates, 98 Ill. 2d 502, 515, 456 N.E.2d 1369 (1983). That is, "the passage of time between the commission of the offense and the arrest has a significant bearing on claims of exigency." White, 117 Ill. 2d at 217.

In White, 117 Ill. 2d at 218, our supreme court held the lapse of nearly two weeks between the commission of the crime and the discovery of the suspect's whereabouts rendered it "extremely unlikely that an additional several hours of delay to obtain a warrant would have enabled the defendant to escape or permitted him to commit another serious crime." In Abney, 81 Ill. 2d at 170, the court noted that the lapse of time between commission of the crime and the discovery of the suspect's whereabouts would make it much less likely that any additional "delay to obtain a

13

warrant would have impeded a promising police investigation and conceivably provided the added time ***needed to avoid capture altogether."

We are dealing with a "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Groh v. Ramirez, 540 U.S. 551, 559, 157 L. Ed. 2d 1068, 124 S. Ct. 1284 (2004), quoting Payton, 445 U.S. at 586. To rebut that presumption we must find "the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 393-94, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978). We see no such exigencies in this record. The State fails to offer any good reason why an arrest warrant was not obtained in this case. If the facts of this case are enough to authorize a nonconsensual entry and arrest in a private home, the "basic principle of Fourth Amendment law" referred to by the Supreme Court has little meaning. Not much would be left of the warrant requirement.

We find the trial court erred when it denied the defendant's motion to suppress the gun.

II. Sufficiency of the Evidence

The defendant next contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt. The

14

defendant argues Hibbler's identification testimony was completely unreliable in light of his unimpeached version of the events because Hibbler had a poor opportunity to view the offender's face, her description of the offender varied, the photo array with which she was presented was suggestive and took place more than two weeks after the crime, and she expressed uncertainty when identifying him.

When a defendant challenges the sufficiency of the evidence, the issue presented is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Collins, 106 Ill. 2d 237, 261, 478 N.E.2d 267 (1985); People v. Slayton, 363 Ill. App. 3d 27, 31, 842 N.E.2d 1168 (2006). The determination of the credibility of witnesses and the weight to give their testimony are issues for the fact-finder to decide and the fact-finder's conclusions are entitled to great deference. People v. Cunningham, 212 Ill. 2d 274, 279-80, 818 N.E.2d 304 (2004).

In Slayton, this court noted that "[t]he identification of defendant by a single witness is sufficient to sustain a conviction despite testimony to the contrary, provided the witness is credible and observed defendant under circumstances that would permit a positive identification to be made."

15

Slayton, 363 Ill. App. 3d at 31.  We also noted that
"[d]iscrepancies in features such as height are not dispositive
because few persons are capable of making accurate estimations of
such characteristics."  Slayton, 363 Ill. App. 3d at 31.

In this case, Hibbler testified no less than three times
that she was able to see the face of the offender in the black
coat.  She was in the offender's presence for the entire
incident, which she estimated to last between three and six
minutes, and identified the defendant as that offender at trial,
as well as in a photographic array and a lineup.  Although she
told the police the offender was approximately six inches shorter
than the defendant's height, she testified at trial that the
offender was taller than Coverson, who was about five feet, eight
inches tall, as she was able to see his face while he grabbed
Coverson from behind.  The jury was presented with detailed
testimony describing the photographic array Hibbler viewed, the
circumstances under which she identified the defendant, and her
possible credibility issues.  It was for the jury to determine
whether Hibbler was believable.

When viewed in the light most favorable to the State,
Hibbler's testimony is sufficient to support a guilty verdict.

III. Prosecutorial Misconduct

The defendant next contends that several aspects of the

16

prosecution's closing and rebuttal arguments amounted to misconduct that denied him his right to a fair and impartial trial. Since the evidence in the new trial will be different, we see no purpose in examining the prosecutor's comments.

IV. Lineup Evidence

The defendant contends Claeson's testimony that he refused to participate in a lineup and the State's use of this evidence in its closing argument denied him his right to a fair trial. The defendant acknowledges he failed to properly preserve this issue for review, but contends we should review the issue under the plain error doctrine. Because the evidence of his refusal to participate in a lineup, if improperly admitted, may affect his right to a fair trial, we will review the merits of the defendant's contention. People v. McGee, 245 Ill. App. 3d 703, 705, 614 N.E.2d 1320 (1993); see also People v. Kennedy, 33 Ill. App. 3d 857, 861, 338 N.E.2d 414 (1975).

As the defendant acknowledges, his participation in a lineup does not implicate his fifth amendment privilege against self-incrimination and he had no right to refuse to participate. See McGee, 245 Ill. App. 3d at 710, citing United States v. Wade, 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926 (1967). The defendant, however, contends that evidence of his refusal to participate in a lineup was inadmissible evidence of his

17

consciousness of guilt. The defendant relies primarily on Kennedy, 33 Ill. App. 3d 857, and People v. Warner, 121 Ill. App. 3d 322, 459 N.E.2d 1053 (1984), for support.

Neither Kennedy nor Warner involves a defendant's refusal to participate in a lineup; rather, in both cases the defendants refused to give a voice sample. In Kennedy, the court held that because the defendant, who was accused of making bomb threats over the telephone, was advised of his Miranda rights but was not told his refusal to give a voice sample could be used against him, his refusal could not be introduced at trial as an admission of his guilt as it "may well have been an exercise of his right to remain silent which the officers had conveyed to him without qualification." Kennedy, 33 Ill. App. 3d at 862. Warner, which involved a defendant's refusal to say "[h]ey you" during a lineup, followed Kennedy and held the defendant's refusal to say the words could not be introduced at trial where he had been advised of his rights under Miranda but not told his refusal to say the words was not protected. Warner, 121 Ill. App. 3d at 326-27.

Kennedy and Warner can be distinguished from this case. In those cases, the defendants were specifically advised they had the right to remain silent and that anything they said could be used against them. It was reasonable for them, as lay persons,

18

to believe they did not have to use their voices, and that their refusal could not be introduced at trial.  See Kennedy, 33 Ill. App. 3d at 862.  That reasoning does not apply in this case, where the defendant was not asked to use his voice, but was told to stand silently in a lineup.  Further, in McGee, 245 Ill. App. 3d at 711, the court rejected the defendant's contention that the admission of evidence demonstrating his refusal to participate in a lineup constituted error.  As in that case, we cannot say that the probative value of the defendant's refusal in this case was substantially outweighed by the danger of unfair prejudice.  See McGee, 245 Ill. App. 3d at 711.  His contention is rejected.

V. 20 Year Sentencing Add-On

Because we remand for a new trial, we see no need to discuss defendant's sentencing issue.

CONCLUSION

For the reasons stated above, the judgment of the circuit court of Cook County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

HALL, J., concurs.

GARCIA, J., dissents.
JUSTICE GARCIA, dissenting:

On the issue of "unnecessary delay," our supreme court has spoken: "'[U]nnecessary delay' is to be measured not from the

time when police officers learn the suspect's location but <u>from the time they obtain probable cause to arrest</u>."  (Emphasis added.)  <u>People v. White</u>, 117 Ill. 2d 194, 218, 512 N.E.2d 677 (1987).  I have not found a single case where passage of time between the crime and the development of probable cause has been considered in deciding whether exigent circumstances are present to justify a warrantless arrest.  The absence of such case law is, of course, understandable given that the reasonableness of the officers' conduct is at issue.  See <u>Abney</u>, 81 Ill. 2d 159, 173, 407 N.E.2d 543 (1980) ("The guiding principle is reasonableness under constitutional provisions governing searches and seizures").  In the absence of probable cause to arrest, the officers could not have taken any action either to apprehend the suspect or to seek a warrant.  <u>Cf.</u> <u>White</u>, 117 Ill. 2d 194.  Accordingly, I am compelled to conclude that the mere passage of time between the crime and the development of probable cause cannot be considered "deliberate or unjustified delay by the officers during which time a warrant could have been obtained." <u>Abney</u>, 81 Ill. 2d at 170.

In <u>White</u>, our supreme court based its finding that the defendant's warrantless arrest on August 23 was not justified by exigent circumstances because the record, while not precise, showed "the police seem[ed] to have received probable cause in the form of statements by eyewitnesses shortly after the killings on August 12."  <u>White</u>, 117 Ill. 2d at 219.  The supreme court

22

noted that under more alarming facts, a contrary decision might be warranted. "The considerations in favor of a finding of exigency are those related to the gravity of the crime, the possibility that the defendant was armed, and the further possibility that he might attempt to escape.  In the proper case, we might find these considerations decisive."  White, 117 Ill. 2d at 219.

Certainly this case amply demonstrates the gravity of the crimes that the defendant had committed; that the officers reasonably believed that the defendant was armed cannot be gainsaid; and, that he might attempt to escape apprehension seems beyond contention.  These considerations are decisive in this case in favor of a finding of exigency.

I would think the majority would have found exigent circumstances to justify the defendant's arrest at his home had the identification of the defendant occurred within 1½ hours of the murder.  Yet, the majority offers no reason to conclude that the officers were any less reasonable in seeking to apprehend the defendant immediately upon developing clear probable cause when the crimes the defendant had committed were no less grave (they were still murder and robbery) within the hour and a half of developing probable cause; the record is barren of any basis to conclude the defendant was not still armed (in fact, he was doubly armed with the handgun he used in committing the murder and a rifle with a high capacity magazine) during that hour and a

23

half; and, had the defendant been tipped to the eyewitness having been to the police station to view a photo display, he undoubtedly would have sought to escape (this inference is warranted based on his reaction at the time of his arrest-he reached in the direction of the handgun). As the assistant State's Attorney argued in the pretrial hearing, the arresting officers knew the defendant could be armed, knew the weapon used in the murder had not been recovered, and knew that the victim had been shot numerous times during the course of the robbery. The officers were also aware that the defendant knew of the existence of an eyewitness as he and his accomplice attempted to force her into the victim's car. "The desirability of apprehending such an individual is obvious, and an officer's reaction should not be unduly criticized unless we are to encourage unreliable, time-consuming speculation as to whether more violence will occur while a warrant is sought." Abney, 81 Ill. 2d at 171. The supreme court's conclusion in Abney is equally apt here: "[T]he officers who entered defendant's home were presented an unusual opportunity to quickly apprehend an armed suspect and thereby prevent his escape, avoid exhaustion of law-enforcement resources, and help ensure against further endangerment to the community."[2] Abney, 81 Ill. 2d at 169.

---

[2] In this vein it bears noting, although unbeknownst to the officers at the time of their arrest of the defendant, the defendant had preyed on the same community in the previous year by

1-04-1360

committing like-violent crimes.  The record establishes that both the charged murder in this case

and the prior year's crimes occurred within a four-block radius of his home.

1-04-1360

With this case, the majority has imposed a standard upon the police that is too high when balanced against the threat posed by a defendant remaining at large while a warrant is being sought. Officers must be free to act upon the gravity of the crime, the dangerousness of the individual, and the corresponding need to apprehend the suspect quickly so long as they act reasonably under the circumstances present (which includes acting nearly immediately upon having probable cause to arrest). Given that the defendant was arrested within an hour and a half of developing probable cause, the officers could reasonably believe that an immediate arrest of the defendant was warranted under the circumstances. The officers' conduct was reasonable as "they did not contemplate their course of conduct for an extended period of time." Abney, 81 Ill. 2d 171. Here, as in People v. Yates, 98 Ill. 2d 502, 517, 456 N.E.2d 1369 (1983), "the trial court correctly found no constitutional infirmity in defendant's warrantless arrest."

Accordingly, I respectfully dissent.

26